JON PUSHINSKY

*v.*

WEST VIRGINIA BOARD OF LAW EXAMINERS

RALPH HAINES, *et al.*

(No. 14706)

Decided April 4, 1980.

Rehearing Denied May 15, 1980.

*Robert M. Bastress* for petitioner.

*Chauncey H. Browning*, Attorney General, *Richard L. Gottlieb*, Assistant Attorney General, for respondents.

MCGRAW, JUSTICE:

Petitioner, Jon Pushinsky, seeks a writ of mandamus to compel the respondents, the West Virginia Board of

Law Examiners, to process his application for admission to the West Virginia State Bar. We are asked to decide if the Board may decline to consider an application for admission to the practice of law when an applicant refuses to answer questions relating to his advocacy of or knowing affiliation with organizations advocating the violent or forceful overthrow of the government. We conclude that compelling applicants to answer the questions put forward here as a prerequisite to admission to the practice of law is constitutionally impermissible and we award the writ.

In June, 1979, petitioner, a citizen and resident of Wheeling, graduated from the University of Pittsburgh Law School and applied for admission to the West Virginia State Bar. Pursuant to Rule 2.000 of the *Code of Rules for Admission to the Practice of Law*,[1] petitioner completed a character questionnaire designed by respondents to elicit information relevant to the applicant's "moral character and qualification for membership in the bar." Question 21 of that form reads as follows:

> 21. Do you advocate or knowingly belong to an organization or group which advocates the overthrow of the Government of the United States of America or of the State of West Virginia by force or violence?
>
> ____ Yes ____ No ____ Decline to Answer
>
> If the answer is "yes," give details.

Petitioner checked "____ Decline to Answer" in response to this question.

Petitioner took the West Virginia Bar Examination in July, 1979. He was later notified that action on his application for admission to the bar was being delayed and was instructed to meet with respondent board member, Jeremy McCamic. At that meeting on September 26, 1979, respondent McCamic asked petitioner whether he

---

[1] Promulgated and adopted by this Court on March 23, 1973, effective August 1, 1973, and amended by order adopted April 9, 1974, and by amendment effective September 19, 1977.

had intended to mark "Decline to Answer" in response to Question 21. Petitioner replied in the affirmative and indicated that he would continue to respond to the question in that manner.

Subsequently, in a letter from respondents' secretary dated October 9, 1979, petitioner was informed that no further consideration would be given to his application until he answered the following questions:

No. 1. Do you advocate the overthrow of the Government of the United States of America or the State of West Virginia by force or violence?

No. 2. Do you knowingly belong to any organization or group which advocates the overthrow of the Government of the United States of America or the State of West Virginia by force or violence? ____

In a letter dated October 17, 1979, petitioner explained that he would not answer the respondents' questions as a matter of individual freedom and constitutional law, but agreed to cooperate fully by answering all other constitutional inquiries. Petitioner was informed by a letter dated October 30, 1979, that because of his failure to answer the questions propounded in the letter of October 9, his application for admission to the bar would not be processed further. Petitioner then instituted this action under the original jurisdiction of this Court.

Petitioner maintains that the questions asked him by respondents impermissibly intrude upon his freedoms of speech, association and belief as guaranteed by the First Amendment to the Constitution of the United States and by article III, section 7 of the West Virginia Constitution.[2] He asserts that the respondents cannot compel

_____

[2] Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S. Const. Amend. I.

No law abridging the freedom of speech, or of the press, shall be passed; but the legislature may by suitable penalties, restrain the

him to answer such questions and cannot refuse to process his application for failure to answer them. Respondents assert that the inability to proceed further with petitioner's application was not due to any political beliefs or associations which he may have had, but was prompted by his refusal to respond to questions propounded by the Board. It is the position of the respondents that Question 21 and the October 9 questions relate to petitioner's good moral character and therefore serve a legitimate state purpose. They maintain that irrespective of petitioner's actual associations or activities with respect to advocating the overthrow of the government,[3] his refusal to answer the questions obstructs the respondents' investigations and is sufficient justification for the board's failure to process the application.

At the outset, we do not think it can be maintained that petitioner failed to respond to Question 21 on the character questionnaire. Petitioner chose one of the three possible answers which respondents provided to the question. The questionnaire did not require any further explanation of the "Decline to Answer" choice and did not indicate that it was an unacceptable answer. Irrespective of which answer was chosen by petitioner, it is clear that he did in fact answer the question as put to him.[4]

Petitioner did, however, refuse to answer "yes" or "no" to the questions asked by respondents in the Octo-

---

publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation. W.Va. Const. art. III, § 7.

[3] There is no allegation by respondents that petitioner has ever engaged in activity or associations which involved advocating the violent overthrow of the government. Nor, claim respondents, is there any reason to believe that petitioner would have been denied admission to the bar if his answers had been in the affirmative.

[4] In fact, petitioner states that he assumed at the time that "Decline to Answer" was included as one of the possible responses to the question in recognition of the First Amendment protection afforded the beliefs and associations of applicants.

ber 9 letter. It was upon this failure to reply that respondents refused to proceed further with petitioner's application.

I

The United States Supreme Court has discussed the issue of whether a state can compel applicants to the bar to answer questions relating solely to membership in certain organizations, consistent with the First Amendment. In *Baird v. State Bar of Arizona*, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971) and *In re Stolar*, 401 U.S. 23, 91 S.Ct. 713, 27 L.Ed.2d 657 (1971), the applicants were denied admission to the bars of Arizona and Ohio, respectively, for refusing to answer questions concerning their past and present affiliation with groups advocating the violent overthrow of the government.[5] A plurality of the Court found that because the inquiries were so broad and vague as to include associations protected by the First Amendment, as well as unprotected ones, the State could not compel an applicant to answer those questions as a prerequisite to admission to the bar without violating his or her right to associate. "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment. Broad and sweeping state inquiries into these protected areas ... discourage citizens from exercising rights protected by the Constitution." *Baird, supra,* 401 U.S. at 6. We think respondents' questions here suffer the same constitutional infirmity of overbreadth as did the inquiries in *Baird* and *Stolar.*

Question No. 1, dealing with petitioner's personal advocacy of the violent overthrow of the government by force or violence, seems to encompass all advocacy, in-

---

[5] In *Baird,* the applicant refused to state "whether she had ever been a member of ... any organization 'that advocates overthrow of the United States Government by force or violence.'" 401 U.S. at 45. In *Stolar,* the applicant was required to state whether he had ever been or was presently "a member of any organization which advocates the overthrow of the government of the United States by force," and to list the names of any groups to which he belonged. 401 U.S. at 27.

cluding that which the United States Supreme Court has held to be protected by the First Amendment. In *Stolar*, that Court declared that the State may not "penalize petitioner solely because he personally ... 'espouses illegal aims'" 401 U.S. at 48-49, *citing Cantwell v. Connecticut*, 310 U.S. 296, 303-304 (1940), and *Baird*. That Court has also held that the First Amendment does not permit a State to proscribe advocacy of the use of violent or illegal action except where the advocacy "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). Indeed, a distinction has long been made between "the mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence" and "preparing a group for violent action and steeling it to such action." *Noto v. U.S.*, 367 U.S. 290, 297-298, 81 S.Ct. 1517, 1520-1521, 6 L.Ed.2d 836 (1961). Statutes failing to make the distinction between "advocacy of the abstract" and "advocacy of action" have been struck down as impermissible intrusions upon the guarantees of the First and Fourteenth Amendments.[6]

Respondents argue that the distinction between advocacy of action and advocacy of the abstract is not applicable here since *Brandenburg* and *Noto* dealt with the standard under which an individual can be criminally prosecuted. They contend that the standard is not the same when dealing with questions put to an applicant to the bar. We think, however, that the distinction was not intended as a standard for determining criminal liability but rather as a demarcation between those forms of speech and association protected by the First Amend-

---

[6] *See Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635, *reh. denied*, 415 U.S. 952, 945 S.Ct. 1476, 39 L.Ed.2d 568 (1974) (statute requiring affidavit of loyalty before placement of candidates' names on ballots); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (Ohio Criminal Syndicalism Act punishing "mere advocacy"). *Cf. Scales v. U.S.*, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); *Yates v. U.S.*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957).

ment, and therefore unable to be abridged by Congress or the States in any manner, and those that are not so protected. The Supreme Court has recently applied the principle in a case not involving criminal sanctions. *See Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974).

Before advocacy can be prohibited by the state then, it must be advocacy of action, something more than merely "espousing illegal aims." Other forms of advocacy are protected by the First Amendment and the failure to respond to inquiries about such protected advocacy may not be used by the state to penalize an individual. Respondents' question No. 1 embraces within its scope all forms of advocacy, including those protected by the state and federal constitutions. We think for that reason the question is fatally overbroad.

We think respondent's question No. 2, which deals with an applicant's knowing membership in an organization which advocates the overthrow of the government by force or violence, also fails to meet the criteria announced in *Baird* and *Stolar* and adopted here by us. Respondents here require only that the question be answered by an applicant who belongs to organizations which he or she knows to have as one of its goals the violent overthrow of the government. Certainly, a question delving into knowing membership is more limited in scope than the questions in *Baird* and *Stolar,* where applicants were required to speculate as to the goals of all organizations or groups with which they had ever been affiliated. However, as noted by Justice Stewart, who concurred in both *Baird* and *Stolar*, state inquiries must be further limited to applicants with the specific intent to further the illegal goals of the organization. *Baird, supra,* 401 U.S. at 9. This principle is supported by a long line of Supreme Court decisions.[7] Respondents'

---

[7] *U.S. v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Elfbrandt v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); *Aptheker v. Secretary of State,* 378 U.S. 500, 84

Question No. 2 is not limited to specific intent on the part of the applicant and therefore embraces associations which the United States Supreme Court has held to be protected by the First and Fourteenth Amendments.

Respondents do not deny that under the test set out above, Question No. 2, dealing with membership in subversive organizations, is constitutionally defective. They contend, however, that when Question No. 2 is read in conjunction with Question No. 1, dealing with personal advocacy, the specific intent limitation is overcome and the questions become permissible inquiries into unprotected activities and associations. Respondents rely on *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971), in which the Court upheld questions asked of applicants to the New York Bar as constitutionally permissible. *Wadmond*, decided and published as a companion case to *Baird* and *Stolar*, legitimized a two-part New York inquiry which delved, first, into the applicant's knowing affiliation with organizations advocating the overthrow of the government and then into the applicant's specific intent to further the illegal goals of the organization.[8]

---

S.Ct. 1659, 12 L.Ed.2d 992 (1964); *Scales v. U.S.*, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); *Schware v. Board of Law Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957).

[8] The New York question reads as follows:

26.(a) Have you ever organized or helped to organize or become a member of any organization or group of persons which, during a period of your membership or association, you knew was advocating or teaching that the government of the United States or any state or any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means?____

If your answer is in the affirmative, state the facts below.

(b) If your answer to (a) is in the affirmative, did you, during the period of such membership or association, have the specific intent to further the aims of such organization or group of persons to overthrow or overturn the government of the United States or any state or any political subdivision thereof by force, violence, or any unlawful means?

Respondents maintain that the October 9 questions, like those in *Wadmond*, include the element of specific intent and are therefore limited only to unprotected associations. We think, however, that the distinction between the *Wadmond* questions and the October 9 questions is clear. The New York questions dealt particularly with the specific intent of the applicant to further the aims of the organization with which he or she is associated to overthrow the government. Respondent's questions do not fulfill this requirement. Rather, respondents would infer from an applicant's affirmative answers that the personal advocacy which he admits necessarily involves the specific intent to further the "subversive" goals of the organization to which he belongs. Such is not necessarily the case. Petitioner may, as we have already held, permissibly advocate the overthrow of the government. He may also belong to an organization which he knows advocates such action. He, himself, however, may have no specific intent to further the illegal aims of the group. Indeed, he may be a member of the organization because it also advocates other worthwhile aims, such as service to the poor. The conclusion respondents would have us draw is precisely the sort of state inquiry which is banned by the First Amendment. The October 9 questions are no more than Question 21 of the character questionnaire broken down into two overly broad inquiries into protected areas of speech, association and belief.

Of course, the Supreme Court's interpretation of the First Amendment is binding on this Court through W.Va. Const. art. I, § 1.[9] Even if it were not, we would be inclined to adopt the high court's approach under our own constitution provision protecting freedom of speech. W.Va. Const. art. III, § 7. Moreover, in view of our state constitutional provision regarding the right of the majority to "reform, alter, or abolish" an inadequate gov-

---

[9] "The State of West Virginia is, and shall remain, one of the United States of America. The Constitution of the United States of America, and the laws and treaties made in pursuance thereof, shall be the supreme law of the land."

ernment,[10] we think that the West Virginia Constitution offers limitations on the power of the state to inquire into lawful associations and speech more stringent than those imposed on the states by the Constitution of the United States. We conclude that questions asked of an applicant to the bar by the Board of Law Examiners inquiring into mere advocacy of or knowing membership in organizations advocating the overthrow of the government by force or violence impermissibly infringe upon rights guaranteed by the First Amendment to the Constitution of the United States and by article III, §§ 3 and 7 of the West Virginia Constitution.

## II

The respondents also maintain that even if the questions asked of petitioner do infringe upon his constitutional rights, the interest of the state in insuring the proper moral character of a bar applicant outweighs the interest of petitioner in asserting his rights. They assert that the Board is permitted to ask any question it deems relevant to an applicant's good moral character and that the failure of an applicant to respond justifies their refusal to process his application.

We think it is beyond question that the state has a legitimate interest in insuring the proper character of a prospective attorney. *Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *In re Eary* 134 W.Va. 204, 58 S.E.2d 647 (1950). We also agree that the state may place upon each applicant, as West Virginia does here, the affirmative burden to prove his good mor-

---

[10] W.Va. Const. art. III, § 3.

Government is instituted for the common benefit, protection and security of the people, nation or community. Of all its various forms that is the best, which is capable of producing the greatest degree of happiness and safety, and is most effectually secured against the danger of maladministration; and when any government shall be found inadequate or contrary to these purposes, a majority of the community has an indubitable, inalienable, and indefeasible right to reform, alter or abolish it in such manner as shall be judged most conducive to the public weal.

al character as a prerequisite to admission to the bar. *Konigsberg v. State Bar of California*, 366 U.S 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961). We do not think, however, that the questions posed by respondents serve to further that purpose in the least restrictive manner.

Respondents state first that every state has a requirement that a bar applicant possess a good moral character. They assert that this is because the state has a right to protect itself from the danger of subversive attorneys. Our research, however, reveals another reason for the requirement.

It was stated in *W.Va. State Bar v. Earley*, 144 W.Va. 504, 109 S.E.2d 420 (1959), that the purpose of limiting the practice of law to those admitted to the bar is "protection of the public from being advised and represented in legal matters by unqualified and undisciplined persons over whom the judicial department of the government could exercise slight or no control." Syl. pt. 6, 144 W.Va. at 504, 109 S.E.2d at 424. "[A]dmission to membership in the legal profession is a privilege granted in the interest of the public to those who are morally fit and mentally qualified for the sole purpose of protecting the unwary and the ignorant from injury at the hands of persons unskilled or unlearned in the law." *Id.*, 144 W.Va. at 528, 109 S.E.2d at 435. "It is the duty of this Court to scrutinize carefully the qualifications of persons who seek to be admitted to practice before the courts of this State, in order that the public may be protected and the courts assisted in the discharge of the vital duties of the administration of law and the resolving of legal controversies." *In re Eary*, 134 W.Va. 204, 208, 58 S.E.2d 647, 650 (1950).

There is no indication in the prior decisions of this Court that the requirement of good moral character was established to protect the state from so-called "subversive attorneys." Rather we think the language of these cases amply indicates that the purpose of the requirements was to insure that dishonest, unscrupulous or corrupt individuals would not use their knowledge of the

law to perpetrate fraud upon the unsuspecting and un-knowledgeable public or to obstruct the proper administration of justice for their own or their clients' benefit. We do not think that this goal can be reached by barring from the practice of law those who merely advocate or belong to groups which advocate the overthrow of the government by force. This cannot be universally proclaimed to be a moral weakness. It appears to this Court, rather, to be a political philosophy. One cannot be held to have failed to prove good moral character in the sense of being an honest and truthful person simply by the fact that he clings to certain political philosophies with which the Board of Law Examiners and, perhaps, a majority of Americans disagree.

Moreover, the respondents have ample evidence of the petitioner's moral character from the other inquiries on the character questionnaire.[11] The answers to these questions sufficiently inform respondents as to the petitioner's moral fitness to practice law. There is no indication that the respondents found petitioner lacking in his responses to those inquiries. Indeed, there was never a finding by respondents that petitioner failed to meet the burden of proving his good moral character. We do not think that an outdated,[12] overly broad inquiry into the

---

[11] The applicant must state, among other things, whether he has ever been suspended or expelled from school; whether he has been dishonorably discharged from the military service; whether he has been court-martialed; whether he has defaulted in the payment of a bona fide obligation; whether there are unsatisfied judgments against him; all civil suits and criminal proceedings to which he is or has been a party; whether he has been refused a fidelity bond; whether he has ever been discharged from employment for dishonesty; whether he is or has been addicted to the use of alcohol or drugs; and whether he has ever been a mental patient. The applicant must also provide the names and addresses of five unrelated persons who have known the applicant well for the preceding five years as well as two attestations as to the applicant's good moral character signed by taxpayers and residents of the applicant's community.

[12] Justice Black, in *Baird*, and *Stolar*, recognized questions similar to those posed here as "relics of a turbulent period known as the 'McCarthy era' ..." *Stolar, supra*, 401 U.S. at 24, and as creat-

private political beliefs and associations of a prospective attorney in any way adds to the information obtained by respondents from the rest of the questionnaire except to provide them with a reason to withhold a license to practice law. "When a state seeks to inquire about an individual's beliefs and associations a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest." *Baird v. State Bar of Arizona*, 401 U.S. 1, 6–7, *citing Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 546, 83 S.Ct. 889, 893, 9 L.Ed.2d 929 (1963). The respondents here have failed to show that the state must have petitioner's answer to the questions in order to assess his moral character.

Finally, respondents maintain that they are allowed to question applicants about any matter which they deem relevant to good moral character. The implications is that respondents have absolute discretion in determining what is relevant to good moral character. While respondents are given great latitude under the *Code of Rules* as to what may be included on the questionnaire, it must be remembered that the power to prescribe qualifications for admission to the bar is an inherent judicial power of this Court under W.Va. Const. art. VIII, § 1. *In re Daniel*, 153 W.Va. 839, 173 S.E.2d 153 (1970); *W.Va. State Bar v. Earley*, 144 W.Va. 504, 109 S.E.2d 420 (1959); *In re Eary*, 134 W.Va. 204, 58 S.E.2d 647 (1950); *In re License to Practice Law*, 67 W.Va. 213, 67 S.E. 597 (1910). This power is expressly conferred upon this Court under the Judicial Reorganization Amendment.[13] We have de-

---

ing ". . . an increasingly divisive and bitter issue for some years, especially since Senator Joseph McCarthy from Wisconsin stirred up anti-Communist feelings and fears by his 'investigations' in the early 1950's." *Baird, supra*, 401 U.S. at 3, 91 S.Ct. at 704.

[13] W.Va. Const. art. VIII, § 3, as found in Committee Substitute for Senate Joint Resolution No. 6, Regular Session, 1974 W.Va. Acts § 3, pp. 948–949, reads in material part:

"The [Supreme Court of Appeals] shall have the power to promulgate rules . . . for all of the courts of the State relating to writs, warrants, process, practice and procedure."

We note that this provision is inaccurately reproduced in Michie's West Virginia Code, Vol. 1 (1978 Replacement Vol.).

termined that the questions asked of petitioner unconstitutionally infringe upon the rights guaranteed him under W.Va. Const. art. III, §§ 7 and 3, and the First Amendment to the U.S. Constitution, and that such questions do not relate to the good moral character of bar applicants.

We hold therefore that the refusal of the Board of Law Examiners to process an application for admission to the bar may not be predicated upon the failure of an applicant to respond to questions which inquire into beliefs and associations protected by the Constitution of the United States and the Constitution of West Virginia. Respondents must process petitioner's application for admission to the practice of law with all due speed and in conformity to the principles enunciated herein.

*Writ Awarded*