**Juan G. POSADA, Jr., M.D., and Georgetown University Hospital, Appellants,**

v.

**Vivian KILPATRICK, Individually and as Personal Representative for Otis E. Kilpatrick, deceased, Appellee.**

No. 85–1523.

District of Columbia Court of Appeals.

Argued June 6, 1988.
Decided Sept. 2, 1988.

---

J. Alan Galbraith, with whom Dianne Jean Smith, Washington, D.C., was on the brief, for appellants.

Benjamin W. Glass, III, with whom Brian C. Shevlin and Joan E. Jennings, Arlington, Va., were on the brief, for appellee.

Before FERREN, ROGERS, and SCHWELB, Associate Judges.

FERREN, Associate Judge:

Dr. Juan G. Posada, Jr., and Georgetown University Hospital appeal from a jury verdict finding them negligent in ordering a lymphangiogram that eventually necessitated amputating the left leg of Otis E. Kilpatrick, appellee's late husband. They argue that the trial court erred in denying their motions for judgment notwithstanding the verdict, for they say, among other reasons, that expert testimony did not support the finding of negligence. Appellants also argue that the trial court erred in granting appellee her costs, and they ask for their own costs. We reverse and remand for entry of judgments notwithstanding the verdict and further remand for reconsideration of awarding the costs of suit.

I.

On April 29, 1980, Mr. Kilpatrick saw Dr. Charles A. Hufnagel at Georgetown University Hospital for treatment of a peripheral vascular disease, a circulatory disorder resulting in a diminished blood supply to the legs. During the visit, Dr. Hufnagel noticed a lump on the left side of Mr. Kilpatrick's neck. After a biopsy, the doctor diagnosed Mr. Kilpatrick as suffering from lymphoma, a tumor in the lymph nodes. Dr. Hufnagel referred Mr. Kilpatrick to Dr. Frederick P. Smith, a specialist in oncology. Dr. Smith became Mr. Kilpatrick's attending physician and was responsible for his medical care in connection with the lymphoma. At the time, Dr. Posada was training in oncology as a fellow assigned to Dr. Smith. When Mr. Kilpatrick arrived, Dr. Smith had Dr. Posada examine him and take his medical history. After Dr. Posada reported his findings, Dr. Smith personally examined Mr. Kilpatrick to confirm the symptoms associated with the lymphoma, as well as the medical history relating to the peripheral vascular disease. Dr.

Smith also examined Mr. Kilpatrick's feet, finding them warm and with good color.

Although it was clear by the end of April that Mr. Kilpatrick had a malignant lymphoma, the doctors had yet to determine what kind of lymphoma it was and how far the disease had spread. The selection of a course of treatment depended on the extent of the disease. If it had spread to the the abdomen, the preferred treatment would involve chemotherapy. If it had not spread that far, chemotherapy could be avoided in favor of radiation therapy, which would expose Mr. Kilpatrick to fewer side effects—an especially important consideration given his peripheral vascular disease. After a chest X-ray and a CT scan on May 1 failed to disclose the spread of Mr. Kilpatrick's malignancy below the neck, Dr. Smith and Dr. Posada discussed ordering a lymphangiogram to diagnose more conclusively whether the lymph nodes in the abdomen had been affected by the malignancy, which by then was known to be Hodgkin's disease. The hope, still, was to avoid chemotherapy, in favor of radiation therapy, if safe to do so.

A lymphangiogram involves injecting a small amount of dye between two toes of each foot and following the movement of that dye to find the lymphatic channels at the top of each foot, where the radiologist then makes an incision to inject a radiographic contrast medium. The incisions are then closed and bandaged. The contrast medium travels up the lympthatic channels through the legs into the abdomen. When the radiologist X-rays the abodomenal lymph system, the contrast medium highlights the lymphatic chain, showing the size and location of the lymph nodes, and allows their internal structure to be represented on film. These films assist in diagnosing malignancy in the lymph nodes and provide a basis for designing radiation treatment if the patient is to undergo that kind of therapy.

Because of Mr. Kilpatrick's peripheral vascular disease, the lymphangiogram entailed the likelihood of delayed healing, and perhaps also of infection, at the incision sites in the feet. In deciding whether to

order a lymphangiogram, therefore, Dr. Smith consulted Dr. Dritschilo, a therapeutic radiologist and the Director of Radiation Therapy, who would be treating Mr. Kilpatrick if such therapy was the chosen course of treatment. Dr. Dritchilo advised Dr. Smith that he needed the lymphaniogram to treat Mr. Kilpatrick. Indeed, he would not irradiate the patient without a lymphangiogram indicating absence of the disease below the diaphragm. If the lymphangiogram could not be performed, therefore, the treatment would have to be chemotherapy. Sometime after May 1, having considered Dr. Dritschilo's views, Dr. Smith decided to order the lymphangiogram. There is no indication in the record that Dr. Posada attended the consultation between Drs. Smith and Dritschilo.

On May 8, 1980, Dr. Michael Mertens performed a lymphangiogram on Mr. Kilpatrick. Before the procedure, Dr. Mohammed A. Suleman, a resident in radiology under the supervision of Dr. Mertens, had examined Mr. Kilpatrick and prepared him for surgery. Noticing that the patient suffered from peripheral vascular disease, Dr. Suleman had passed on his finding to Dr. Mertens, who had instructed him to contact Dr. Posada to determine whether this infliction had been taken into account when Dr. Smith ordered the lymphangiogram. Dr. Suleman spoke over the phone with Dr. Posada, who then went to the room where Mr. Kilpatrick was being prepared for the procedure. Dr. Posada observed Mr. Kilpatrick through the window. He returned to his other duties without speaking to Mr. Kilpatrick. The record does not show what, if anything, Dr. Posada said to Dr. Suleman about Mr. Kilpatrick's peripheral vascular disease and the lymphangiogram, but, in any event, Dr. Mertens went ahead with the procedure apparently satisfied that it was not inadvisable.

The lymphangiogram showed no malignancy in Mr. Kilpatrick's abdominal lymph nodes. Dr. Dritschilo proceeded with radiation treatment of Mr. Kilpatrick's tumor. The treatment was successfully completed by mid-June 1980.[1] The top of Mr. Kilpatrick's left foot, however, did not heal from the incision made during the lymphangiogram. As a consequence, on November 28, 1980, his left leg was amputated below the knee.

Two years later, Vivian Kilpatrick, Mr. Kilpatrick's widow, filed a complaint, on behalf of herself and as personal representative of her late husband's estate, against Georgetown University Hospital (Georgetown) and three physicians who had treated her husband: Drs. Smith, Posada, and Suleman. She alleged that Dr. Smith had been negligent in "requesting" the lymphangiogram, that Dr. Posada had been "negligent in allowing the [lymphangiogram] to proceed with the knowledge he possessed regarding the peripheral vascular disease of the decedent," and that Dr. Suleman was negligent in performing the procedure. She also complained that all three doctors had failed to obtain Mr. Kilpatrick's informed consent for the lymphangiogram and had been negligent in treating him after the procedure. She further alleged that Georgetown was vicariously liable for the negligence of the doctors. On behalf of Mr. Kilpatrick, she sought to recover for the injuries resulting from the lymphangiogram; and, on behalf of herself, Mrs. Kilpatrick sought compensation for loss of consortium. In addition, she requested the court to award her costs.

In January 1985, Judge Webber granted defendants' motion for summary judgment on the claims of alleged negligent performance of the lymphangiogram and negligent post-lymphangiogram treatment. The court, however, found that "the issues of *negligent ordering* of the lymphangiogram, failure to obtain *informed consent* and *loss of consortium*" remained to be litigated. (Emphasis in original.) The record indicates no objection by counsel for Mrs. Kilpatrick to this statement of issues for trial. Nor does it show any attempt by Mrs. Kilpatrick to define "ordering," as she had in her complaint against Dr. Posada, not merely as the initial "ordering" itself but as an ongoing decisional process cover-

---

1. In August, 1982, Mr. Kilpatrick died of a malignancy unrelated to his Hodgkin's disease.

ing the period from the date of the decision to request the lymphangiogram to the time of its actual performance. With regard to the informed consent issue, the court concluded there was "no dispute of fact that Mr. Kilpatrick was aware of the risks and potential complications which could have resulted from the procedure." What was left for determination at trial regarding informed consent, therefore, was "whether or not *any alternative treatment procedures* were offered to the plaintiff patient." (Emphasis in original.)

At the close of plaintiff's case, the trial court directed a verdict for Dr. Suleman on the issue of negligent performance of the lymphangiogram (the court earlier had granted summary judgment for all defendants on that issue). At the end of trial, the jury, using a special verdict form, returned a verdict in favor of all defendants on the issue of informed consent. The jury also found that Dr. Smith had not been negligent in ordering the lymphangiogram. The jury, however, found, Dr. Posada and, vicariously, Georgetown negligent for ordering that procedure. (Plaintiff had not alleged Dr. Suleman had participated in the ordering.) The jury awarded Mrs. Kilpatrick individually $10,000 for loss of consortium and, as representative of her late husband, $50,000.

Before discharge of the jury, the defendants moved to resubmit the case to the jury to resolve what they saw as an inconsistency in the verdict for Dr. Smith and against Dr. Posada and Georgetown on the same issue—negligent ordering of the lympathangiogram—especially because, they said, the evidence showed that Dr. Smith alone had ordered the procedure and that the only complaint against Dr. Posada was

his allegedly negligent failure to stop it from taking place. The trial court denied this motion.

Dr. Posada and Georgetown then filed a written motion for judgments notwithstanding the verdict. They argued, once again, that Dr. Posada had not ordered the lymphangiogram and, therefore, that he and Georgetown could not possibly have been negligent in ordering the procedure. They further contended that, because the jury verdict on the issue of informed consent could only be interpreted to mean there had been no alternative to the lymphangiogram, the implication had to be that, even if Dr. Posada had participated in ordering the procedure, as a matter of law he could not have done so negligently since the court previously had found that Mr. Kilpatrick had been informed of the risk. At the hearing on the motion, the parties agreed that the jury had found Dr. Posada negligent in "ordering" the lymphangiogram only because he had failed to stop performance of the procedure on May 8. The defendants argued that there was no expert testimony to support such a verdict. On October 15, 1985, Judge Webber denied the motion for judgments n.o.v. and awarded costs to Mrs. Kilpatrick.

 Dr. Posada and Georgetown have appealed, alleging that the trial court erred in denying their motion for judgments n.o.v. They contend that there was insufficient evidence to show Dr. Posada had participated in ordering the lymphangiogram and that, even if there was sufficient evidence, Mrs. Kilpatrick had failed to present the expert testimony necessary to show that Dr. Posada's actions had violated the applicable standard of care.[2] Dr. Posada

2. Appellants also allege that Mrs. Kilpatrick's expert witness at trial, Dr. William Brownlee, a general surgeon, was not qualified to testify on the standard of care for oncology, therapeutic radiology, and vascular surgery. They further argue that the trial court abused its discretion in refusing to strike Dr. Brownlee's testimony because he refused to acknowledge, on cross-examination, that a treatise by Dr. Henry S. Kaplan was authoritative while he later revealed that he had relied on an article co-authored by Dr. Kaplan. Appellants concede that, in this jurisdiction, a licensed physician is permitted to

give expert testimony on the standard of care in a medical specialty even if it is not in the particular area of his or her expertise. *Baerman v. Reisinger*, 124 U.S.App.D.C. 180, 363 F.2d 309 (1966). The trial court, therefore, did not abuse its discretion in refusing to strike Dr. Brownlee's testimony for lack of proper credentials. Nor did the court abuse its discretion in refusing to strike Dr. Brownlee's testimony because of his reliance on Dr. Kaplan's article. Indeed, we perceive no basis for the trial court to have stricken the testimony. The court found that the reliance on Dr. Kaplan was mi-

and Georgetown also contend the trial court erred in awarding Mrs. Kilpatrick her costs, and they seek an award of their own costs.

## II.

In reviewing the denial of a judgment n.o.v., "'this court must view the evidence and all reasonable inferences in the light most favorable to the party who obtained the jury verdict' and must reverse 'only if no juror could reasonably reach a verdict for the opponent of the motion.'" *District of Columbia v. Cassidy*, 465 A.2d 395, 397–98 (D.C.1983) (per curiam) (quoting *Marcel Hair Goods Corp. v. National Savings & Trust Co.*, 410 A.2d 1, 5 (D.C. 1979)). In order to prevail in a medical malpractice action, the plaintiff must prove three elements: the applicable standard of care, a deviation from that standard of care, and a causal relationship between that deviation and the alleged injury. *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984). The standard of care must be established by expert testimony unless "a lay person, relying on common knowledge and experience, can find that the harm would not have occurred in the absence of negligence...." *Id.* at 581 n. 4; *accord, Sponaugle v. Pre–Term, Inc.*, 411 A.2d 366, 368 (D.C.1980); *Haven v. Randolph*, 161 U.S.App.D.C. 150, 151, 494 F.2d 1069, 1070 (1974) (per curiam) (when alleged blunder is so egregious that lay person is capable of comprehending its enormity, expert testimony on standard of care may not be required; but where negligence turns on merits and performance of scientific treatment, issue may not be resolved without aid of expert testimony). In the present case, the negligence issue turns upon the risks and benefits of the lymphangiogram

in evaluating the spread of Hodgkin's disease on a patient with peripheral vascular disease. The technical nature of this controversy requires establishment of the applicable standard of care through expert evidence.

Several questions concerning Dr. Posada are presented in this appeal: (1) Did Dr. Posada have any responsibility for the decision to order the lymphangiogram in the first place? (2) Even if not, could the failure to call off the lymphangiogram between the date it was initially ordered, sometime after May 1, and the time it was performed, May 8, be considered part of the decision to "order" the procedure? (3) If so, did any event occur during that period, or was there any other reason, tending to support a jury finding (if based on expert testimony) that Dr. Posada was negligent in failing to take any step to question or stop the decision to conduct the procedure? (4) If so, did plaintiff present expert testimony that could properly serve as a basis for the jury to find such negligence?

### A.

According to Dr. Smith's and Dr. Posada's trial testimony, Dr. Posada examined Mr. Kilpatrick and took his medical history on April 29, 1980. Dr. Posada did not recall discussing diagnostic or "staging" procedures with Dr. Smith that day, but he did recall that soon they did so and discussed doing a lymphangiogram only if the CT scan turned out to be negative. Dr. Posada also recalled discussing with Dr. Smith that a lymphangiogram was a safer diagnostic procedure than a laparotomy[3] and was likely to yield almost as much relevant information. Consequently, he said, a laparotomy "was never considered." Referring to the staging procedures, Dr.

---

nor in comparison with all the other bases for Dr. Brownlee's opinion.

In making these arguments, appellants seek only to buttress their case for insufficient evidence; they do not seek a new trial. Nor do they seek a new trial based on the allegedly inconsistent verdicts exonerating Dr. Smith but finding Dr. Posada liable for negligently ordering the lymphangiogram. Appellants candidly admit that the costs of a new trial would, in effect, erase the benefits of such relief.

**3.** A laparotomy is surgery to open the abdomen. Plaintiff's expert witness, Dr. Brownlee, testified that instead of ordering a lymphangiogram, the responsible physicians could have chosen a laparotomy as a diagnostic procedure to see the lymph nodes in the abdomen. They also could have used a laparoscopy or a one-sided lymphangiogram, he said.

Smith, in a deposition read into evidence, testified that "as the studies were done at the time, I would delineate and supervise plans and we'd have a one-step, two-step, three-step type of situation with my fellow, Dr. Posada. I was the director of the clinical fellowship program." That is all the direct evidence of Dr. Posada's participation at the time of Dr. Smith's decision sometime after May 1 to order a lymphangiogram.

Dr. Dritschilo, the doctor in charge of radiation therapy, testified that Dr. Posada's role as a fellow in oncology, training under Dr. Smith, was to do "a history and physical to complete the legal requirements for the particular situation. The decisions were made by the attending doctor, Dr. Smith, and myself." Taking into account Mr. Kilpatrick's peripheral vascular disease, Dr. Dritschilo advised Dr. Smith that it was up to Smith's clinical judgment what diagnostic procedures to undertake and whether to do the lymphangiogram or to proceed, instead, with chemotherapy. There is no evidence that Dr. Posada participated in Dr. Smith's consultation with Dr. Dritschilo.

The foregoing evidence indicates that, as the attending physician supervising a clinical fellow in oncology, Dr. Smith discussed the staging and treatment of Mr. Kilpatrick with Dr. Posada. Dr. Smith himself did not testify about these discussions with Dr. Posada, aside from references to the initial medical examination and the patient's medical history. Dr. Posada did testify at length about these discussions and, in doing so, did not differentiate between his and Dr. Smith's roles, typically using the word "we." Dr. Smith, however, testified without contradiction that "Dr. Posada was under my supervision." Dr. Posada described attending physicians, such as Dr. Smith, as "mentors," and Dr. Dritschilo testified that such "mentors" "review[ed] everything" and that they alone made the decisions. Taken altogether, the evidence shows Dr. Posada was consistently characterized as a fellow "in training" or as working "under" Dr. Smith.

Accordingly, although there is evidence that Dr. Posada discussed the alternative staging procedures with Dr. Smith, none of this evidence would support a reasonable finding that the eventual decision to order the lymphangiogram was Dr. Posada's to make or that he had any responsibility for Dr. Smith's decision, other than being a consultative resource. It is true the record shows that on May 8, immediately before the lymphangiogram, Dr. Suleman, at Dr. Mertens' request, asked Dr. Posada whether account had been taken of Mr. Kilpatrick's peripheral vascular disease. The record does not indicate how Dr. Posada replied, if at all. It does show that Dr. Posada then looked in on Mr. Kilpatrick but did not speak with him. The evidence also shows that Dr. Posada eventually wrote a letter to Dr. Hufnagel to inform him of the staging procedures that Mr. Kilpatrick had undergone. This evidence, however, cannot be used to infer a greater role for Dr. Posada in the initial decision-making than the other evidence allows. In sum, nothing in the record permits a reasonable finding that Dr. Posada was jointly responsible with Dr. Smith for initially ordering the lymphangiogram.

## B.

 The next question, then, is whether the failure to call off a lymphangiogram during the week after it was ordered could be considered part of an allegedly negligent "ordering" of the procedure. Mrs. Kilpatrick's complaint alleged Dr. Posada's negligence "in allowing the [lymphangiogram] to proceed with the knowledge he possessed regarding the peripheral vascular disease of the decedent." Mrs. Kilpatrick did not attempt to clarify along this line, however, the court's order characterizing the issue as to all defendants simply as *"negligent ordering"* of the lymphangiogram. (Emphasis in original.) That is of no moment, however, for, in any event, it is reasonable to infer from the record (for example, from Dr. Mertens' request that Dr. Suleman consult with Dr. Posada about the patient's peripheral vascular disease) that Dr. Posada had ongoing monitoring responsibility for Mr. Kilpatrick. Further-

more, it is reasonable to infer that any physician with that responsibility would be obliged to take action to call off a scheduled procedure if a change of circumstances so indicated; obviously, in ordering any procedure, the assumption has to be that the conditions will continue to warrant it up to the time it takes place. In this sense, a procedure is not finally ordered until it is implemented, and we do not believe it is unreasonable to say that Dr. Posada could be held liable for "negligent ordering" if he came upon new information that, in the exercise of reasonable care, he should have used as a basis for questioning, if not stopping, the operation.

There is, moreover, another possible theory of liability based on old information: if the "ordering" process is not complete until the procedure is actually carried out, then arguably any physician on a case in a position to interdict an inherently negligent decision to operate may have a responsibility to do so, even if that physician was not responsible for the decision to operate. We shall proceed on that assumption.

### C.

The question then becomes: whether any event occurred, or any other reason emerged, that reasonably could have triggered a finding of negligence during the week after the lymphangiogram had first been ordered. The record reflects only one overt incident: Dr. Suleman's inquiry of Dr. Posada, at Dr. Mertens' request, as to whether the peripheral vascular disease, which "concerned" the radiologists, had been taken into account in ordering the lymphangiogram.

There is no record evidence that Mr. Kilpatrick's condition had worsened between the date Dr. Smith ordered the lymphangiogram (sometime after May 1) and the date it took place (May 8). Nor did Dr. Suleman or any other witness indicate any factor that Dr. Smith had not considered or suggest any material change of circumstances. Finally, it is not self-evident that a question about the patient's disease by a radiologist (Dr. Suleman) in itself amounted to a special warning to an oncologist. In short,

unless there was expert testimony that could support a separate finding of negligence during the period *after* Dr. Smith initially had ordered the lymphangiogram (on or about May 1), it is not evident that Dr. Posada would have been negligent in declining to pursue Dr. Suleman's inquiry. That inquiry, so far as one can tell, was merely a question that added nothing to undermine what Dr. Posada already knew: Dr. Smith was fully aware of the patient's disease and had taken that into account in ordering the lymphangiogram.

This does not complete the picture, however, given Dr. Smith's alleged negligence in ordering the lymphangiogram in the first place. That suggests the question whether Dr. Posada, as a subordinate in the case, had an ongoing duty to act against his superior during the week before the operation, even though there may have been no change of circumstances. That question, too, suggests a need for expert testimony.

### D.

Mrs. Kilpatrick's expert witness, Dr. William Brownlee, testified at trial that Dr. Smith, as the attending oncologist, violated the applicable standard of care in selecting a lymphangiogram for Mr. Kilpatrick in light of his peripheral vascular disease. He stated that the risk of Mr. Kilpatrick's losing his leg was too great to justify the information that the lymphangiogram would have yielded; a laparotomy (which Dr. Smith had rejected) would have been preferable. *Supra* note 3.

As indicated earlier, no evidence of record implicated Dr. Posada in the initial decision to order the lymphangiogram; thus, Dr. Brownlee's testimony that this decision, assignable to Dr. Smith, violated the applicable standard of care had no bearing on Dr. Posada unless that testimony somehow could be applied to Dr. Posada's behavior *later*, during the week before May 8, such as his failure to act on Dr. Suleman's inquiry or his failure, in any event, to act in some way against Dr. Smith's decision.

Inherent in any breach of duty by a clinical fellow who participates in a case but perceives (or reasonably should perceive) that the supervising physician has made a negligent decision would have to be the following professional obligation: either to resign the case or to press the supervisor to change the decision until the allegedly negligent operation is called off or performed despite the fellow's best efforts to stop it. Conceivably, there is such a responsibility, including a duty to report concerns to other officials within the hospital hierarchy, but Dr. Brownlee did not so testify. He did not testify that a medical subordinate, absent changed circumstances, must continue to try to overturn the superior's decisions, if negligent, or be held professionally accountable (and thus jointly responsible for breach of the standard of care). Indeed, none of Dr. Brownlee's testimony pertained to the question whether Dr. Posada, confronted with Dr. Suleman's later inquiry or otherwise aware of the risk to Mr. Kilpatrick, should have done something about the lymphangiogram after the initial decision had been made.

At one level, one can argue that any resident physician who assists a supervising physician in carrying out what any physician reasonably should know is an inherently negligent operation should be jointly liable for that negligence. On the other hand, a medical judgment often is just that—a judgment—on which reasonable, competent physicians can differ. As this case illustrates, it is far from clear from the jury's verdict that the lymphangiogram was ill-advised. Thus, without expert testimony as a guide, it is not clear that a physician in Dr. Posada's position should have attempted to prevent the lymphangiogram, even if he should have had doubts about the procedure Dr. Smith ordered. A mutiny of subordinates may be called for on occasion, but the jury needed more guidance as to the criteria for judging such nullifying behavior in a medical context, especially given the court's very general instruction: "a physician is required to have and use that degree of skill, care and learning ordinarily possessed and used by members of his profession in the same line of practice, acting in the same or similar circumstances."

Dr. Brownlee did testify about Dr. Posada on the informed consent issue: Dr. Posada had a duty to inform the patient of the risks and alternatives to the lymphangiogram. Dr. Brownlee added, however, that because Dr. Posada worked under Dr. Smith's supervision, Dr. Smith bore primary responsibility for obtaining informed consent from Mr. Kilpatrick. After further discussion about informed consent, and without addressing specifically how Dr. Posada may have breached that standard of care, Dr. Brownlee testified about proximate cause in response to questions from plaintiff's counsel as follows:

Q Lastly, Doctor, do you have an opinion, also based upon a reasonable degree of medical certainty, whether or not they deviated from appropriate medical standards as you have just outlined, and as they apply to Doctors Smith, Posada, and Suleman, whether they proximately caused the gangrene and amputation suffered by Mr. Kilpatrick?

A I do.

Q What are they?

A That the amputation, the gangrene, the infection were all directly related and caused by lymphangiogram.

Q Were they proximately caused by the deviation by the physician attending it?

A Indeed.

The discussion of informed consent and this exchange about proximate cause constituted all of Dr. Brownlee's testimony about Dr. Posada. Even seen in the light most favorable to Mrs. Kilpatrick, *Cassidy*, 465 A.2d at 397–98, Dr. Brownlee's testimony did not establish a standard of care requiring Dr. Posada, after learning of the radiologists' concern about the circulatory disorder, or for any other reason, to interdict performance of the lymphangiogram or at least to relay the concern to his superior, Dr. Smith. Without such expert testimony, the jury lacked a proper basis for finding Dr. Posada, Dr. Smith's subordinate, liable for "negligent ordering" of the lymphangiogram.

We therefore reverse and remand the case to the trial court for entry of judgments notwithstanding the verdict on the issue of negligent ordering of the lymphangiogram. In view of our disposition, the trial court on remand shall reconsider awarding the costs of suit.

*So ordered.*