Cornelia F. DUTCHER, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 87–2871.

United States District Court, District of Columbia.

March 21, 1990.

James E. Joyner, Oxon Hill, Md., for plaintiff.

John C. Cleary, Asst. U.S. Atty., Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

This Federal Tort Claims Act case was tried before the Court without a jury on July 25, 26, and 27, 1989. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court enters the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

1. Plaintiff, Cornelia Dutcher, is the mother of the deceased, Jeffrey Miller, and is the duly authorized Administratrix of his estate.

2. On April 8, 1985, plaintiff's decedent, Jeffrey Miller, was voluntarily admitted to the Veterans Administration Medical Center in Washington, D.C. (VAMC). In 1979, when he was first admitted to the VAMC, where he was an inpatient for five months, he was diagnosed as being afflicted with schizophrenia, paranoid type. From that time on, he was in and out of various VA hospitals for the treatment of this illness. He was discharged from the United States Marine Corps in 1984 with a service connected disability rating of 50%, later reduced to 30%.

3. At the time of his admission in April 1985, he was diagnosed as suffering from psychosis; he was out of touch with reality and some of his thoughts surrounded persecutory ideas. He was noted to be paranoid and delusional with auditory hallucinations.

4. Jeffrey Miller was suffering from paranoid schizophrenia, which was previ-

ously diagnosed in 1978 while he was on active duty in the United States Marine Corps. His illness over the intervening years had been chronic and persistent, and was progressive and deteriorative in nature.

5. Schizophrenia is a psychosis that takes place in the presence of a clear sensorium.[1] Frequently, it first occurs in young adulthood, and those afflicted primarily have disorders of thought content. They have delusional ideas, and they may have disorganized thinking, as well as hallucinations of various types. Paranoid schizophrenia is dominated by paranoia: delusions of persecution, delusions of being influenced by an outside force.

6. The purpose of Jeffrey Miller's admission to the VAMC in 1985 was to stabilize his psychotic symptomatology; to relieve him of any suicidal and/or homicidal ideation; to assess his strengths and weaknesses; and to invite the participation of his family and to evaluate how the family could be used at a later time when Jeffrey was discharged from the facility.

7. At the time of his admission, Jeffrey Miller expressed suicidal ideations and some vague homicidal thoughts. He did not, however, express suicidal intent, nor did he have a definitive suicide plan. Subsequent to his admission, Jeffrey Miller repeatedly and consistently denied that he was suicidal or homicidal.

8. Jeffrey Miller was admitted to an unlocked ward, which is part of a form of treatment known as milieu therapy. An unlocked ward is used in an effort to create a community that will encourage resocialization, reintegration of the personality, calming down and containment of psychiatric symptoms. The doors are unlocked because, when a door is locked, patients have less of a sense of responsibility in controlling themselves, in growing and in overcoming their illnesses.

9. The care and treatment rendered Jeffrey Miller by the VAMC met the medical standard of care appropriate for such patients. He was admitted to an open ward for milieu therapy; he was treated with neurologic medication; he received group therapy, individual therapy, and supportive therapy, and efforts were made to include family therapy. It was a very typical regimen of treatment for this patient's affliction.

10. There was no evidence presented at trial by the plaintiff that the care and treatment rendered Jeffrey Miller by the VAMC between April 8 and April 12, 1985, was not within the applicable standard of medical care.

11. On April 12, 1985, at 11:30 a.m., Dr. Ian Goldberg lifted the ward restriction and granted Jeffrey Miller "buddy privileges," which permit a patient access to areas outside the ward so long as he is in the company of another patient on the ward.

12. At or before 4:00 p.m. on April 12, 1985, Jeffrey Miller met with Dr. Goldberg, his treating physician, and stated that he wanted to leave the hospital, which would be against medical advice. Dr. Goldberg spoke with Jeffrey for some time and, at about 4:30 p.m., he also called Jeffrey's mother, Cornelia Dutcher, asking her to intervene and to encourage Jeffrey to stay in the hospital. She spoke to her son, who agreed with both Dr. Goldberg and his mother to stay in the hospital and not to leave against medical advice as he had planned.

13. On the same day (April 12, 1985), shortly after this meeting, Jeffrey Miller left the VAMC without being discharged and against medical advice. At 6:00 p.m., when his absence was discovered, he was placed on AWOL status. At this time the nurse on duty, Debra Thomas, called Jeffrey's mother's home to inform the family that Jeffrey had left the hospital. Previously, she had reported Jeffrey's absence to the duty officer and called VA Security and the Medical Administration.

14. Ms. Thomas reached the mother's home and spoke on the telephone with Mark "Tony" Miller, Jeffrey's brother.

---

**1.** Sensorium is defined as referring to "the parts of the brain concerned with the reception and interpretation of sensory stimuli." *Webster's Seventh New Collegiate Dictionary,* p. 789.

She informed him that Jeffrey had left the hospital; stated that if Jeffrey returned home, Tony should ask him to call and let VAMC know how he was; and indicated that if Jeffrey expressed any suicidal or homicidal feelings, Tony should return him to the hospital immediately.

15. At approximately 7:00 p.m., having just arrived home without any luggage, Jeffrey Miller himself called the VAMC from his mother's residence. During the conversation between Jeffrey and Debra Thomas, the nurse on duty, Jeffrey reported that he was feeling better and that he felt his medication was working better. He denied having hallucinations, problems with God or religion, or that he wanted to harm himself. Ms. Thomas encouraged him to return to the hospital but Jeffrey stated that it "was not necessary now." He also stated that he would return to the hospital on Monday to pick up his cigarettes.

16. At approximately 7:30 p.m. on April 12, 1985, Jeffrey Miller committed suicide by shooting himself in the head with a rifle owned by his mother and kept loaded in her home. There was no one else in the house at the time, Tony having left to purchase cigarettes and ice cream at a store a short distance away and having returned twenty to twenty-five minutes later to find his brother's body on the floor of his mother's bedroom.

17. The suicide was an act of impulse, not a planned act. It could not be predicted and there was no way to have prevented it.

18. The VAMC did not call the Virginia or District of Columbia police to report that Jeffrey Miller had left the VAMC without permission and against medical advice. It was not a breach of the standard of care for the VAMC not to have called the police since calling the police was not warranted in this case. Furthermore, it is entirely speculative, given the brief interval of time between 6:00 p.m. when his absence was discovered and Jeffrey's death no more than one and one-half hours later, to assume that calling the police would have been effective in preventing Jeffrey Miller's suicide.

19. Practitioners notify the police only if an involuntary hospitalization is at issue. For a person to be involuntarily committed, there must be a showing that he is an imminent threat to himself or others.

20. Jeffrey Miller did not meet the criteria for involuntary commitment at any time during his hospitalization or after he left the hospital on April 12, 1985.

21. There was no testimony or other evidence presented at trial to support the position that had the VAMC contacted the Virginia police, this action would have been effective in preventing Jeffrey Miller's suicide. Dr. Merrill Berman testified that he did not know how fast the police would have responded or whether there was enough time for the police to be effective. Dr. Berman, a Maryland practitioner, has not had the experience of calling the police regarding a patient since the 1970's, and has never had to call the District of Columbia or Virginia police regarding a patient.[2]

22. Dr. Berman also gave as his opinion that the proximate cause of Jeffrey Miller's death was the VAMC's failure to adequately inform the family of the danger and to attempt to bring Jeffrey back to the hospital after he absconded. In forming this opinion, Dr. Berman made several assumptions:

a. That Tony Miller would have believed and acted upon a warning from the VAMC;

b. That an action by Tony Miller to return Jeffrey to the hospital would have been successful;

c. That Jeffrey Miller would have met the criteria for involuntary admission to the facility.

23. In formulating his opinions, Dr. Berman also assumed that if the police had arrived at the plaintiff's home in time, the family would have come forward and

---

**2.** Dr. Berman had essentially an office practice, and had not treated patients in a hospital setting for the past nineteen years.

turned Jeffrey over to them to be committed, an event that had never occurred previously.

24. Prior to April 12, 1985, Jeffrey Miller had never been involuntarily committed to any facility. Prior to April 12, 1985, Jeffrey Miller had had only one previous incident of a suicidal nature. This occurred in 1978 while he was in solitary confinement in Camp LeJeune and consisted of his ingesting a small amount of Noxzema shaving cream, and inflicting a superficial cut on his left wrist. This incident was not regarded as serious and may have been related to the fact he was in solitary confinement.

25. Prior to his admission on April 8, 1985, Jeffrey Miller had never been gainfully employed and had been seeking an increase in benefits from the VA above his 50% service connected disability rating.

26. To a reasonable degree of medical certainty, had Jeffrey Miller not committed suicide on April 12, 1985, he would in all likelihood not have become a productive member of society. The best predictor of future performance is past performance, and Jeffrey Miller's past performance provided no basis for optimism as to his future employment.

27. Dr. Berman offered testimony at trial that to a reasonable degree of medical certainty, Jeffrey Miller's chances of remission or recovery were "50/50 depending." The basis for this opinion was that recovery or remission was dependent on several positive factors, including referral to a Department of Rehabilitation, earning a G.E.D., being trained in a job and a productive lifestyle, being amenable to medication, having the proper family support, individual psychotherapy, and the co-operation of the patient.

28. Jeffrey Miller's VA medical records reveal that all of the measures cited by Dr. Berman as being necessary for remission or recovery had been tried unsuccessfully in the past.

29. Testimony by Dr. Richard Lurito, the plaintiff's economic expert, regarding loss of future income was based solely on the expected testimony by Dr. Berman that Jeffrey would have returned to work within one year of his death had he received proper therapy, medication and vocational therapy. If Dr. Berman's predicate is not established, Dr. Lurito admitted that his economic report has no factual foundation whatsoever. Based on the record in this case, Dr. Lurito's economic report is without factual foundation and is therefore valueless.

## II. CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680.

2. This is a claim for medical malpractice alleging injury under the wrongful death and survival statutes of the District of Columbia, D.C.Code 1981, §§ 16–2701 to 16–2703, 16–101.

3. This District of Columbia Law is controlling as to the negligence law to be applied to an action brought in the District of Columbia under the Federal Tort Claims Act. *Rayonier Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957).

4. Under District of Columbia Law, three elements are required to render a defendant liable for damages based on negligence: (1) a duty owed the plaintiff by the defendant to conform to a certain standard of care; (2) a breach of this duty by the defendant; and (3) an injury to the plaintiff that was proximately caused by the defendant's breach. *See O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C.App.1982); *Hartke v. McKelway*, 707 F.2d 1544, 1549 (D.C.Cir.), *cert. denied*, 464 U.S. 983, 104 S.Ct. 425, 78 L.Ed.2d 360 (1983).

5. The plaintiff bears the burden of proving, by a preponderance of the evidence, the applicable standard of care; that this standard has been violated; and that there is a causal relationship between the violation and the injury. *Morrison v. Mac-Namara*, 407 A.2d 555, 560 (D.C.App.1979). Ordinarily, in a medical malpractice case, expert testimony is required in order to prove the proper standard of care and causation. *Posada v. Kilpatrick*, 547 A.2d 163, 168 (D.C.App.1988); *Sponaugle v. Pre–Term, Inc.*, 411 A.2d 366, 368 (D.C.

App.1980); *Washington Hospital Center v. Butler*, 384 F.2d 331, 335 (D.C.Cir.1967).

6. Proximate cause is that cause which, in actual continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred. *Wagshal v. District of Columbia*, 216 A.2d 172, 175 (D.C.App. 1966); *Price v. Neyland*, 320 F.2d 674, 678–79 n. 12 (D.C.Cir.1963); *Hannon v. Fletcher*, 231 F.2d 469, 475 (D.C.Cir.), *cert. denied*, 351 U.S. 989, 76 S.Ct. 1051, 100 L.Ed. 1501 (1956).

7. The Court concludes that the plaintiff has failed to present any competent evidence to support a finding that the defendant breached the applicable standard of care or that any acts or omissions by the defendant proximately caused the death of Jeffrey Miller on April 12, 1985.

8. The facts of this case are essentially undisputed by the parties.

a. On April 8, 1985, Jeffrey Miller was admitted to the VAMC suffering from psychosis. He was noted to be paranoid and delusional and reported that he was experiencing auditory hallucinations. He was admitted to the hospital for stabilization of his psychotic symptomatology. At the time of admission he also expressed some thoughts consistent with suicidal ideation but he did not express suicidal intent, nor did he have a definitive suicide plan.

b. At the time of his admission, Jeffrey was 25 years old and suffering from paranoid schizophrenia, which was first diagnosed in 1978 while he was serving in the Marine Corps. Schizophrenia is a form of psychosis which takes place in a clear sensorium. These patients primarily exhibit disorders of thought content and may have disorganized thinking as well as delusions. Paranoid schizophrenia is dominated by paranoia such as delusions of persecution or delusions of being influenced by an outside source. Prior to the April 8, 1985, admission, Jeffrey had received treatment at various times since 1979 at the Washington, D.C. VAMC and the VAMC in Salem, Virginia. This treatment included many admissions for treatment of psychosis.

c. Jeffrey was treated at the VAMC from April 8 to April 12, 1985, when he left the hospital against medical advice. During this period he received appropriate care and treatment consisting of ward restriction, neurologic medication, and group, individual and supportive therapy. In addition, efforts were made to include family therapy as part of the treatment plan.

d. During the course of his treatment, he was noted to improve in that he began to socialize more and exhibited fewer signs of psychosis. He repeatedly and continuously denied any suicidal ideations or intent and stated that they were just "words of frustration."

e. At or about 4:00 p.m. on Friday, April 12, 1985, Jeffrey approached his treating physician, Dr. Ian Goldberg, and stated that he wanted to leave the hospital. The reasons for this decision are unclear; however, family members testified that Jeffrey had informed them that he intended to come home for the weekend and return to the hospital on the following Monday. Dr. Goldberg discussed the matter with Jeffrey and contacted Jeffrey's mother at work in an effort to have her convince Jeffrey to remain in the hospital. At the completion of the telephone conversation with his mother, Jeffrey informed Dr. Goldberg that he would stay in the hospital. He also denied any suicidal ideations during this meeting.

f. However, Jeffrey did not stay. Sometime after this meeting, Jeffrey left the hospital, against medical advice, taking all of his clothes and most of his personal belongings. This was discovered at approximately 5:30 p.m. and at 6:00 p.m., he was placed on AWOL status. At that time, the nurse on duty, Debra Thomas, contacted the hospital police, the medical officer on duty, and the hospital medical administration service. She also called Jeffrey's mother's home. She spoke at that time with Mark "Tony" Miller, Jeffrey's brother. At or about 7:00 p.m., Jeffrey arrived at his mother's residence. After being advised by his brother that the hospital had called looking for him, Jeffrey called the ward and spoke with Ms. Thomas. During

this conversation, he denied any suicidal intent or ideations.

g. After his conversation with Ms. Thomas, Jeffrey and his brother prepared to watch television. They decided they needed cigarettes and snacks, so at or about 7:30 p.m., Tony went to a store a short distance away. When he returned home about twenty to twenty-five minutes later he discovered that Jeffrey had committed suicide by shooting himself in the head with a rifle that was kept loaded in his mother's room.

9. This Court further concludes that no evidence was presented at trial that the defendant breached the applicable standard of care in the care and treatment rendered Jeffrey Miller at the VAMC from April 8 through April 12, 1985. The plaintiff's medical expert, Dr. Merrill Berman, proffered testimony that the defendant breached the standard of care in failing to notify the Virginia police when it was discovered that Jeffrey had left the hospital and in failing to be rigorous in informing family members of the danger and urging that they return Jeffrey to the hospital. Dr. Berman further testified that the failure to inform family members and urge them to return Jeffrey to the hospital was the proximate cause of Jeffrey's death.

10. Dr. Berman's position that the defendant breached the standard of care in failing to notify the Virginia police was based on an erroneous assumption that Jeffrey Miller was actively suicidal at the time he left the hospital. No testimony or other evidence introduced at trial would substantiate this position. Although Jeffrey had expressed some suicidal ideation at the time of admission, he had no suicidal intent, nor did he have a definitive suicide plan. The medical records document that he repeatedly denied suicidal ideation after his admission and appeared to be planning for the future. He even expressed a desire to get a job.

11. It was the testimony of the defendant's expert, Dr. David Goldstein, that it is customary for practitioners to notify the police that a patient has left the hospital only in those situations where involuntary

hospitalization is an issue. We credit this testimony. For a person to be hospitalized involuntarily there must be some evidence that he is an imminent threat to himself or others. Jeffrey Miller had voluntarily hospitalized himself. There was no evidence in this case to support a finding that Jeffrey Miller was an imminent danger to himself or others at any time prior to the moment he shot himself, or that defendant's medical personnel at VAMC were aware or should have been aware of such danger.

12. In addition to his failure to provide a reasonable basis for his position that the applicable standard of care required notification of the police, Dr. Berman was unable to substantiate that the VAMC's failure to notify the police was the proximate cause of Jeffrey Miller's death. He admitted that he did not know whether the police would have responded, or, if they had responded, whether they could have prevented the suicide, given the short period of time between the discovery of Jeffrey's absence and his death.

13. Dr. Berman's second contention, that the defendant's failure to warn Jeffrey's family adequately and to urge them to return him to the hospital proximately caused Jeffrey's death, is equally without merit. The medical records and the testimony at trial clearly show that the family early on had notice that Jeffrey had expressed some suicidal thoughts. On the other hand, there was no evidence presented at trial to substantiate a finding that the family would have taken any different course of action had it been provided additional information. Dr. Berman's opinion that the failure to adequately inform the family was the proximate cause of Jeffrey's death is thus unsubstantiated. It was based on speculation and assumptions without any reasonable basis.

14. Finally, the plaintiff has failed to present any competent evidence to substantiate a finding by the Court that the defendant, between April 8 and April 12, 1985, breached the standard of care applicable to the care and treatment of Jeffrey Miller at the facility, or that any alleged acts or

omissions by the defendant after Jeffrey Miller absconded on April 12, 1985, were the proximate cause of his death. Jeffrey Miller's suicide was an act of impulse directly resulting from his long existing mental illness.

An Order consistent with the foregoing has been entered this day.

## ORDER

This case was tried before this Court on July 25, 26, and 27, 1989. The Court has considered the evidence presented, the arguments of both parties, and the applicable legal standards. For the reasons stated in accompanying Findings of Fact and Conclusions of Law entered this day, it is this 20th day of March, 1990,

ORDERED that judgment is entered in favor of defendant; and it is

FURTHER ORDERED that this case is dismissed with prejudice.