357 S.E.2d 240

**STATE of West Virginia**

v.

. **Diana L. WELKER.**

No. 17128.

Supreme Court of Appeals of
West Virginia.

April 28, 1987.

Rehearing Denied June 3, 1987.

**48**

Dina M. Mohler, Asst. Pros. Atty., for appellant.

Roger P. Forman, Michael Crane, Charleston, for appellee.

NEELY, Justice:

On 25 April 1985, a Cabell County jury convicted Diana Welker of the premeditated murder of her four-year-old daughter Patricia. On appeal Mrs. Welker raises several assignments of error. Because we find three of Mrs. Welker's assignments meritorious, we reverse and remand for a new trial.

### I

At about 7:30 p.m. on 15 February 1984, Mrs. Welker and her live-in boyfriend, David Adkins, reported the disappearance of four-year-old Patricia Welker to the State Police. Mrs. Welker claimed not to know the whereabouts of Patricia, but offered several hypotheses, all of which she knew to be false. After the police had searched for Patricia for a week without success, Mrs. Welker confessed to Corporal Robert Estep of the State Police that she and David Adkins had, on 15 February 1984, placed Patricia's dead body into the Kanawha River.

In her statement, Mrs. Welker claimed that, on 15 February 1984, she had left Patricia at home in a perfectly healthy and normal condition. Mrs. Welker had gone out to attend appointments with her lawyer and her counselor at about 1:00 p.m. on 15 February 1984, and returned at about 4:00 p.m. Upon her return, Mrs. Welker stated, she found Patricia dead.

Mrs. Welker stated that she and David Adkins took Patricia's body down to the Kanawha River at about 7:00 p.m. on 15 February 1984. When Mrs. Welker was asked why she had reported Patricia missing, Mrs. Welker stated, "because I was scared, I thought they would accuse me of doing something to Patricia." Mrs. Welker indicated in her statement that she had spanked Patricia "a little too hard" on the evening of 14 February 1984. Mrs. Welker stated that she had hit Patricia with her open hand on her buttocks and lower back, which areas were badly bruised by the beating.

At trial, several witnesses testified that Patricia Welker and David Welker, Mrs. Welker's infant son, had been neglected and abused in the past. Dr. David Allie testified that David Welker had been brought to the emergency room at Thomas Memorial Hospital on 24 December 1983 by David Adkins and Mrs. Welker. Dr. Allie found David Welker to be very dehydrated, listless, unresponsive, thin and battered. The inside of David's mouth was so dry that the lining of the mouth was cracked and bleeding. The child was severely undernourished, and was bruised on his arms, legs and buttocks. David had open sores on his genitals and a laceration on his head. David was subsequently treated by other doctors for a fractured leg, a broken nose, and a fractured jaw.

Arnold Scarberry testified that he had observed Diana Welker striking and cursing Patricia with little or no provocation on several occasions. Mr. Scarberry also testified that David Welker often appeared filthy and undernourished. Mr. Scarberry further testified that he had at various times observed bruises on David Welker's head, chest and arms, bite marks on David Welker's leg, and burns on David Welker's legs and genitals.

Kim Turley testified that Diana Welker cursed Patricia when Patricia wanted attention or food, that Diana was unkind to David, that Diana had whipped both children, and that Diana had whipped Patricia with a belt on several occasions.

Ralph Welker, the estranged husband of Diana, and the father of Patricia and David, testified that he had seen Diana whip Patricia with a belt, and had had to intervene during one such beating because Diana was going "too far." Mr. Welker further testified that while he and Diana were living together and David Welker was young, he had discovered welts on his son's buttocks while changing his diaper. However, Dr. Ward Harshbarger, David Welker's treating physician, testified that, when David had been hospitalized eight months earlier for a lung infection (before Mrs. Welker had met Mr. Adkins), he had shown no signs of abuse.

Several other witnesses offered testimony essentially corroborating the testimony recited above. Although there was no direct evidence that Diana had actually killed Patricia, there was substantial circumstantial evidence from which a jury might reasonably have inferred that Diana Welker had maliciously and premeditatedly caused her daughter's death.

## II

Appellant's most serious assignment of error concerns the refusal of the trial court to admit testimony that would have tended to exculpate her. On 18 April 1985, about three weeks into the trial, counsel for Mrs. Welker informed the trial court in chambers that they had reason to believe that David Adkins had confessed to a Mrs. Louise Morrison that he had killed Patricia Welker. It appears that a Mrs. Claytor had informed counsel for Mrs. Welker that Mrs. Morrison had told her of David Adkins' confession. When counsel contacted Mrs. Morrison directly, Mrs. Morrison told counsel that she had made a commitment to David Adkins not to divulge the substance of their conversation. Mrs. Morrison expressed a reluctance to testify regarding her conversation with David Adkins, and counsel apparently intended to subpoena her.

As represented by counsel for Mrs. Welker, Mrs. Morrison's testimony would have revealed that: David Adkins had confessed to killing Patricia Welker; Diana had not been home at the time of the slaying; David Adkins was angry with Patricia for getting between him and the television; Patricia's eyes had popped out of her head, she had foamed at the mouth, and her little legs had kicked against the wall; and David Adkins had watched Patricia Welker die.

The trial court ruled that Mrs. Morrison's testimony regarding David Adkins' statements to her were inadmissible hearsay. We disagree. Rule 804(b) of the *West Virginia Rules of Evidence* states:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: * * * (3) Statement against Interest.—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man [person] in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissable [admissible] unless corroborating circumstances clearly indicate the trustworthiness of the statement.

We find that the testimony of Mrs. Morrison, had it been similar to that which was represented by counsel, would have fallen squarely within this exception to the hear-

say rule. The statement clearly tended to subject David Adkins to criminal liability, and tended to exculpate Diana Welker. Moreover, corroborating circumstances clearly indicate the trustworthiness of the statement. There was substantial evidence on the record tending to show that David Adkins is a man of loathsome character eminently capable of such an act. Moreover, as we shall discuss below, there was substantial probative and admissible evidence regarding David Adkins' sordid past that was kept from the jury.

We held in Syllabus Point 2 of *State v. Dobbs*, 163 W.Va. 630, 259 S.E.2d 829 (1979):

> Circumstantial evidence will not support a guilty verdict, unless the fact of guilt is proved to the exclusion of every reasonable hypothesis of innocence; and circumstances which create only a suspicion of guilt but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction.

As we stated above, the prosecution presented substantial circumstantial evidence from which the jury could have inferred Mrs. Welker's guilt. However, the substance of Mrs. Morrison's potential testimony raises the reasonable hypothesis that David Adkins, and not Diana Welker, killed Patricia Welker. The jury was entitled to hear this testimony, evaluate its credibility, and weight it against the evidence tending to prove the guilt of Diana Welker. Until Mrs. Morrison's testimony has been heard and evaluated, Diana Welker's conviction for first degree murder cannot be sustained.

### III

Appellant's second assignment of error concerns the refusal of the trial court to admit into evidence portions of David Adkins' psychiatric records and the testimony of other witnesses regarding David Adkins' past behavior. This evidence tended to show that: Mr. Adkins has a history of physical and sexual abuse of children; Mr. Adkins suffers from visual and auditory hallucinations; Mr. Adkins interprets these auditory hallucinations as the voices of demons instructing him to perform certain acts; Mr. Adkins has attempted suicide several times in the past at the behest of these demonic voices; Mr. Adkins has been diagnosed as having numerous psychiatric disorders, ranging from depressive neurosis to schizophrenic psychosis; in 1982 Mr. Adkins was declared incompetent to stand trial on a charge of grand larceny; and, Mr. Adkins has a history of engaging in destructive, antisocial, and criminal behavior.

Rule 404 of the *West Virginia Rules of Evidence*, like its federal counterpart, generally restricts the use of character evidence introduced for the purpose of proving that a person acted in a particular manner on a particular occasion. Rule 404 is an attempt to codify the common law rules on the admission of character evidence, and we therefore look to the common law for guidance.

Professor Wigmore, the preeminent authority on the common law rules of evidence, sets forth his position on the admission of evidence of the character of third parties in his monumental *Treatise on the Anglo-American System of Evidence in Trials at Common Law:*

> Where the character offered is that of a *third person, not a party* to the cause, the reasons of policy * * * for exclusion seem to disappear or become inconsiderable; hence, if there is any relevancy in the fact of character, i.e. if some act is involved upon the probability of which a moral trait can throw light, the character may well be received. On this principle it has been admitted to evidence the *illegitimacy* of one claiming an inheritance, to evidence the adultery of a *co-respondent in divorce* or other third person, and to show a different parentage for a *bastard* in affiliation proceedings; and the principal may equally apply (subject to the limitations of §§ 139–142 *post* ) to evidence the commission of any crime by a *third person*, particularly the *forging* or coercing of a *will or deed*, and in sundry other situations.

*Wigmore on Evidence* (second edition 1923) at pp. 298–99 (footnotes omitted; em-

phasis in original). Wigmore goes on to elaborate his position in § 139:

> The question that arises, from the point of view of the *Rules of Evidence*, is whether, in evidencing this doing by a third person as a fact of disproof, any unusual requirements shall be made as to the strength of the evidence before it can be admitted. Thus, to prove A guilty of murder, evidence of his threats (i.e. a design) to commit it are always admissible * * *; now, if the fact to be proved is that B committed the murder (as inconsistent with A's guilt) why should not B's threats be admitted, without further restriction, as A's are? It is true that evidence of B's threats alone would not go far towards proving B's commission; *but it is not a question of absolute proof nor even of strong probability, but only of raising a reasonable doubt as to A's commission; and for this purpose the likelihood of B's commission may suffice or at least assist.* The evidence of B's threats, to be sure, may, in a given instance, be too slight to be worth considering; but it seems unsound as a general rule that mere threats, or mere evidentiary facts of any sort, are to be rejected if unaccompanied by additional facts pointing towards B as the doer. Nevertheless, most Courts have shown an inclination to make some such restriction, and to insist that two or more kinds of evidentiary facts pointing towards B must be offered, and that one kind alone will not be received. It is difficult to see the object of this restriction, because if the evidence is really of no appreciable value, no harm is done in committing it; while if it is in truth calculated to cause the jury to doubt, the Court should not attempt to decide for the jury that this doubt is purely speculative and fantastic, but should afford the accused every opportunity to create that doubt. A con-

trary rule is unfair to a really innocent accused.

*Id.* at p. 368 (emphasis supplied).

It is clear from Wigmore's text and notes that the view advocated in the above quoted passages was a minority view at common law. Moreover, this view has yet to attain the status of the majority rule in the federal courts of the United States. *See* S. Saltzburg and K. Redden, *Federal Rules of Evidence Manual* (4th edition, 1986) at pp. 236–37. However, this view has gained favor in at least two of the federal circuits, *see United States v. Robinson*, 544 F.2d 110 (2d Cir.1976), *cert. denied*, 434 U.S. 1050, 98 S.Ct. 901, 54 L.Ed.2d 803 (1978), and *United States v. McClure*, 546 F.2d 670 (5th Cir.1977), as well as in the courts of several states. *See United States v. Aboumousallem*, 726 F.2d 906, 910–11 (2d Cir.1984), and cases there cited. Because we find the logic of this view especially compelling in the context of a circumstantial evidence case on a charge of first degree murder, we find that the trial court erred in excluding the proffered character evidence.[1]

■ The state maintains that the evidence offered of Mr. Adkins' character was inadmissible because it did not meet the requirements set forth in Syllabus Point 1 of *State v. Harman*, 165 W.Va. 494, 270 S.E.2d 146 (1980). There we stated:

> In a criminal case, the admissibility of testimony implicating another person as having committed a crime hinges on a determination of whether the testimony tends to directly link such person to the crime, or whether it is instead purely speculative. Consequently, where the testimony is merely that another person had a motive or opportunity or prior record of criminal behavior, the inference is too slight to be probative, and the evidence is therefore inadmissible. Where, on the other hand, the testimony provides a direct link to someone other

---

1. We do not mean to imply that the trial court erred in excluding *all* of the evidence offered of David Adkins' character. Rule 403 of the *West Virginia Rules of Evidence* permits the trial judge to exclude otherwise admissible evidence when admission would result in "undue delay, waste of time, or needless presentation of cumulative evidence." However, insofar as the evidence offered of David Adkins' character does not fall within the ambit of Rule 403, it should be admitted at a new trial.

than the defendant, its exclusion constitutes reversible error.

In applying *Harman* to this case, it must be remembered that the case against Diana Welker was *entirely* circumstantial. There was no evidence *directly* linking *anyone* to the crime. However, the circumstantial evidence admitted at trial excluded the possibility that Patricia Welker died either accidentally or at the hand of an intervening neighbor or stranger. There were two custodians of the child: Diana Welker and David Adkins. The only reasonable hypothesis inconsistent with the guilt of Diana Welker was that David Adkins had actually killed Patricia Welker. Viewed in this light, we find that our holding in *Harman* actually militates in favor of permitting Mrs. Welker to introduce evidence regarding David Adkins' character. However, such evidence of character should be limited to those traits consistent with the elements of the crime for which the defendant is being tried.[2]

## IV

Appellant's third assignment of error concerns testimony elicited by the State on its redirect examination of State Trooper Gary Karastury. The pertinent parts of this examination proceeded as follows:

Q. Did you learn as a result of the investigation how Patricia Welker died, Trooper Karastury, and at whose hands?

A. Yes, sir. I was told by David Adkins—

At this point, counsel for Mrs. Welker interposed an objection. A colloquy ensued, and the court ruled that the trooper's testimony regarding David Adkins' statements was admissible. The examination then proceeded as follows:

Q. Go Ahead.

A. Yes, sir. I was told that Diana Welker had spanked or disciplined Patricia rather severely prior to the child's death.

Q. Well, how severely? Did he describe it to you?

A. As I recall, he stated that white foam or some kind of matter had come out of the child's mouth and nose, that the child had been bruised up and had gone to bed not feeling well.

Q. Well, how much detail did you get about this situation, Trooper?

A. I got details that the child had been bruised, like I say, that white foam or white matter was coming out of the child's mouth and nose; and, as I recall, there was some inference as to water breaking, but I saw no—I didn't understand what the person was talking about and I don't know that that was ever clarified, what Adkins was talking about.

At the conclusion of Trooper Karastury's testimony, counsel for Mrs. Welker made a

---

**2.** The State makes two further arguments regarding the admissibility of the character evidence. First, the State contends that the evidence of past misdeeds was properly excluded because it was too remote in time from Patricia's death to be probative. In Syl. pt. 6 of *State v. Gwinn*, 169 W.Va. 456, 288 S.E.2d 533 (1982), we held: "As a general rule remoteness goes to the weight to be accorded the evidence by the jury, rather than to admissibility." We recognize that "the decision on remoteness as precluding the admissibility of evidence is generally for the trial court to determine in the exercise of its sound discretion." *Gwinn*, 169 W.Va. 472, 288 S.E.2d at 542. However, as we stated in *Yuncke v. Welker*, 128 W.Va. 299, 311–12, 26 S.E.2d 410, 416 (1945), quoting *State v. Yates*, 21 W.Va. 761 (1883):

[A]n abuse of discretion is more likely to result from excluding, rather than admitting, evidence that is relevant but which is remote in point of time, place and circumstances, and

that the better practice is to admit whatever matters are relevant and leave the question of their weight to the jury, unless the court can clearly see that they are too remote to be material.

We find that the proffered evidence of David Adkins' character was not clearly "too remote to be material." The trial court therefore erred in excluding the evidence on that ground.

Second, the State argues that Mr. Adkins' psychiatric records are inadmissible hearsay. We disagree. The proffered records clearly fall within the exception set forth in *W.Va.R.Evid.* 803(4), which treats as admissible evidence:

Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

motion for a mistrial in chambers. That motion was denied.

 The Trooper's testimony regarding statements made by David Adkins clearly constituted hearsay not falling within any exception. The State contends that any error in admitting this testimony was harmless because Diana Welker herself had previously admitted to spanking Patricia "too hard" on 14 February 1984. This contention fails for two reasons. First, no other evidence adduced at trial made any mention of white foam coming out of Patricia's mouth or nose, nor of Patricia's going to bed not feeling well, nor of any water breaking. Second, the phrasing of the State's question read in combination with Trooper Karastury's answer, namely, "Q. Did you learn as a result of the investigation how Patricia Welker died, Trooper Karastury, and at whose hands? A. Yes, sir. I was told by David Adkins—" created the impression that Trooper Karastury had learned from David Adkins that Diana Welker had killed Patricia. This fact Trooper Karastury clearly did not know. This error is aggravated by the fact that Trooper Karastury's testimony was the only direct evidence of criminal agency offered in an otherwise completely circumstantial evidence case. We therefore cannot agree with the State's contention that this error was harmless.

For the foregoing reasons, the judgment of the Circuit Court of Cabell County is reversed, and the case remanded for a new trial.

Reversed and remanded.