406 S.E.2d 200

**Gladys GILMAN and Bruce Gilman**

v.

**Young I. CHOI, M.D., Pleasant Valley Hospital, Inc., a Corporation, Bakshy Chhibber, M.D., and Thomas J. Moska-lewicz, M.D.**

No. 19635.

Supreme Court of Appeals of
West Virginia.

Dec. 19, 1990.

Opinion of Chief Justice Neely
Concurring in Part and
Dissenting in Part
Jan. 25, 1991.

Herbert H. Henderson, Gail Henderson–Staples, Huntington, for Gladys Gilman and Bruce Gilman.

Michael Farrell, Jenkins, Fenstermaker, Krieger, Kayes & Farrell, Huntington, for Pleasant Valley Hosp.

Don R. Sensabaugh, Jr., Edward C. Martin, Kay, Casto, Chaney, Love & Wise, Charleston, for Thomas J. Moskalewicz.

Sprague W. Hazard, Steptoe & Johnson, Charleston, for Young I. Choi.

Stephen D. Annand, Donald L. Stennett, Shuman, Annand & Poe, Charleston, for Dr. Bakshy Chhibber, M.D.

McHUGH, Justice:

In this certified question case this Court is asked essentially to decide the validity of a recent statute on expert testimony in a medical malpractice action, specifically, *W.Va.Code*, 55–7B–7 [1986], in light of the *West Virginia Rules of Evidence*. The Circuit Court of Mason County upheld the validity of the statute, and we, too, believe the statute is valid, but for a reason not assigned by the circuit court.

## I

One of the two plaintiffs, Gladys Gilman, sustained a hip fracture and dislocation as the result of a recreational vehicle accident in October, 1986.[1] Soon after the accident, Mrs. Gilman was seen in the Pleasant Valley Hospital emergency room by defendant Thomas J. Moskalewicz, M.D., an emergency room physician working in that hospital's emergency department. Dr. Moskalewicz ascertained that Mrs. Gilman had suffered a fracture of the left hip. He contacted defendant Dr. Young Choi, a general surgeon, and Mrs. Gilman was admitted to the hospital.

The plaintiffs have alleged in their medical malpractice action that Dr. Moskalewicz, an emergency room physician, Dr. Bakshy Chhibber, an internist/family practitioner and the plaintiffs' family physician, as well as Dr. Choi, a general surgeon, and Pleasant Valley Hospital were each negligent in their treatment and care of Mrs. Gilman, thereby necessitating a total hip replacement and causing her to endure permanent pain and suffering.

The plaintiffs have designated Dr. Thomas G. Galli, a board certified orthopedic surgeon who practices the specialty of orthopedics, as an alleged expert witness against all of the defendants. Two of the defendant doctors, Dr. Chhibber and Dr. Moskalewicz, filed motions *in limine* asserting that Dr. Galli, as an orthopedic surgeon, is not qualified to testify as an expert witness as to the standard of care of an internist/family practitioner or of an emergency room physician.

The trial court (the Circuit Court of Mason County) ruled that Dr. Galli was not qualified to testify against Dr. Chhibber and Dr. Moskalewicz under condition precedent (e) set forth in *W.Va.Code*, 55–7B–7 [1986].[2] The trial court also ruled that

1. The other plaintiff, Bruce Gilman, has alleged that the defendants' negligence has proximately caused an impairment of spousal consortium (the companionship, society, etc., of his wife).

2. *W.Va.Code*, 55–7B–7 [1986] provides:

*W. Va. Code*, 55–7B–7 [1986] was not in conflict with Rule 702 of the *West Virginia Rules of Evidence*.[3] At the request of the plaintiffs, and pursuant to Rule 13 of the *West Virginia Rules of Appellate Procedure* and the provisions of *W. Va. Code*, 58–5–2 [1967], the trial court certified the following question to this Court, which question was answered in the negative by the trial court:

> Is West Virginia Code § 55–7B–7 (Cum.Supp.1988), requiring that an expert in a medical malpractice case be qualified in the 'same or substantially similar' medical field as a physician defendant against whom he/she intends to testify, in conflict with Rule 702 of the West Virginia Rules of Evidence which provides that an individual may testify as an expert if he/she is 'qualified' because of 'knowledge, skill, experience, training or education' to assist the trier of fact and, if so, does any such conflict invalidate the statute or otherwise render it inapplicable?

## II

■ *W. Va. Code*, 55–7B–7 [1986], *see supra* note 2, authorizes a trial court to require "the testimony of one or more knowledgeable, *competent* expert witnesses" to establish the applicable standard of care in a medical malpractice action and a defendant's failure to meet that standard, if at issue. (emphasis added) That same statute also sets forth five specific foundational prerequisites for admissibility of such testimony. The only one of these foundational requirements at issue here mandates

that "(e) such expert is engaged or qualified in the same or substantially similar medical field as the defendant health care provider."

The terms of this statute indicate that the legislature's paramount concern was with the *competency* of the proffered expert testimony. Under Rule 601 of the *West Virginia Rules of Evidence*, "[e]very person is competent to be a witness *except as otherwise provided for by statute* or these rules." (emphasis added) Accordingly, this Court, by virtue of Rule 601 of the *West Virginia Rules of Evidence*, has elected to defer to the legislature when it enacts statutes on the competency of witnesses. For example, this Court, in the recent case of *Cross v. State Farm Mutual Automobile Insurance Co.*, 182 W.Va. 320, 387 S.E.2d 556 (1989), concluded that a particular statute on the competency of witnesses, namely, the Dead Man's Statute, *W. Va. Code*, 57–3–1 [1937], is still valid under Rule 601. *Id.* 182 W.Va. at 324, 387 S.E.2d at 560.

In view of the foregoing we hold that *W. Va. Code*, 55–7B–7 [1986], being concerned primarily with the competency of expert testimony in a medical malpractice action, is valid under Rule 601 of the *West Virginia Rules of Evidence*.

It is, therefore, not necessary to decide whether *W. Va. Code*, 55–7B–7 [1986] conflicts with Rule 702 of the *West Virginia Rules of Evidence*, which is concerned primarily with the relevancy of expert testimony. *See* syl. pts. 1–2, *State v. McCoy*, 179 W.Va. 223, 366 S.E.2d 731 (1988). "In

---

The applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, *competent* expert witnesses if required by the court. Such expert testimony may only be admitted in evidence if the foundation, therefor, is first laid establishing that: (a) The opinion is actually held by the expert witness; (b) the opinion can be testified to with reasonable medical probability; (c) such expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (d) such expert maintains a current license to practice

medicine in one of the states of the United States; and *(e) such expert is engaged or qualified in the same or substantially similar medical field as the defendant health care provider.* (emphasis added)

**3.** Rule 702 of the *West Virginia Rules of Evidence*, effective February 1, 1985, states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

a certified case this Court will not consider certified questions not necessary to a decision of the case." Syl. pt. 6, *West Virginia Water Service Co. v. Cunningham,* 143 W.Va. 1, 98 S.E.2d 891 (1957). *Accord, State Automobile Mutual Insurance Co. v. Youler,* 183 W.Va. 556, 561 n. 5, 396 S.E.2d 737, 742 n. 5 (1990); syl. pt. 5, *Anderson v. Moulder,* 183 W.Va. 77, 394 S.E.2d 61 (1990); syl. pt. 7, *Shell v. Metropolitan Life Insurance Co.,* 181 W.Va. 16, 380 S.E.2d 183 (1989).

Moreover, upon receiving certified questions from circuit courts of this state, we retain some flexibility in determining how and to what extent those questions will be answered. *Belcher v. Goins,* 184 W.Va. 395, 398 n. 2, 400 S.E.2d 830, 833 n. 2 (1990); *State Automobile Mutual Insurance Co. v. Youler,* 183 W.Va. 556, 561 n. 5, 396 S.E.2d 737, 742 n. 5 (1990); *Deeds v. Lindsey,* 179 W.Va. 674, 676 n. 2, 371 S.E.2d 602, 604 n. 2 (1988); *City of Fairmont v. Retail, Wholesale & Department Store Union,* 166 W.Va. 1, 3–4, 283 S.E.2d 589, 590 (1980). *Cf. Maynard v. Board of Education,* 178 W.Va. 53, 60, 357 S.E.2d 246, 253 (1987) (this Court addressed issue of laches, which was related to certified question on statute of limitations).

■ Although the question of abuse of discretion is not before us, we note that whether a witness is qualified to state an opinion is a matter which rests within the sound discretion of the trial court, and its ruling on that point ordinarily will not be disturbed unless it clearly appears that its discretion has been abused. Syl. pt. 12, *Board of Education v. Zando, Martin & Milstead, Inc.,* 182 W.Va. 597, 390 S.E.2d 796 (1990), and 182 W.Va. at 612, 390 S.E.2d at 811 (citing cases).

■ In this regard it would be an abuse of discretion for a trial court to require the proffered expert witness to be board certified in the same medical specialty as a particular defendant health care provider. *W.Va.Code,* 55–7B–7 [1986] does not impose such a requirement by the use, in condition precedent (e), of the words "qualified in the same or substantially similar medical field[.]" If the legislature had intended such a board certification requirement, it could have provided explicitly therefor, as, for example, the legislature of Florida did in enacting *Fla.Stat.Ann.* § 766.102 (West 1988).[4]

Rule 702 of the *West Virginia Rules of Evidence, see supra* note 3, also does not require the proffered expert witness to be board certified in the same medical specialty as a defendant health care provider. *See, e.g., Darling v. Reid,* 534 So.2d 255, 257 (Ala.1988) (lack of board certification goes to weight, not to admissibility); *Pearson v. Parsons,* 114 Idaho 334, 336–37, 757 P.2d 197, 199–200 (1988) (in part, discussing a state evidentiary statute on medical malpractice expert testimony which was nearly identical to *W.Va.Code,* 55–7B–7 (1986)); *Glover v. Ballhagen,* 232 Mont. 427, 756 P.2d 1166 (1988) (involving *Mont.R.Evid.*

**4.** The material portion of *Fla.Stat.Ann.* § 766.102 (West 1988) is as follows:

(2) ...

....

(b) If the health care provider whose negligence is claimed to have created the cause of action is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself [or herself] out as a specialist, a 'similar health care provider' is one who:

1. Is trained and experienced in the same specialty; and

2. Is *certified* by the appropriate American *board* in the same specialty.

(emphasis added)

Under the same Florida statute, in subsection (2)(c)(2), even if the proffered expert witness is not a "similar health care provider," compared

with the defendant, he or she may still testify as to the prevailing professional standard of care if the witness

to the satisfaction of the court, possesses sufficient training, experience, and knowledge as a result of *practice or teaching in the specialty* of the defendant or practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience, or knowledge must be as a result of the active involvement in the practice or teaching of medicine *within the 5-year period before the incident* giving rise to the claim.

This approach is consistent with the words "qualified in the same or substantially similar medical field," which are used in *W.Va.Code,* 55–7B–7 [1986].

702, which is identical to *W. Va.R.Evid.* 702).

While we do not decide in this case whether *W. Va.Code*, 55–7B–7 [1986] is more restrictive than Rule 702 of the *West Virginia Rules of Evidence*, there are certain common-law principles which are applicable under either that statute or that evidentiary rule. First, a medical expert, otherwise qualified, is not barred from testifying merely because he or she is not *engaged in practice* as a specialist in the field about which his or her testimony is offered; on the other hand, it is clear that a medical expert may not testify about any medical subject without limitation. *Swanson v. Chatterton*, 281 Minn. 129, 139, 160 N.W.2d 662, 669 (1968). Second, a plaintiff in a medical malpractice action must prove that the defendant specialist failed to meet the standard of care required of physicians in the same specialty practiced by the defendant; and to qualify a witness as an expert on that standard of care, the party offering the witness must establish that the witness has more than a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in the defendant's specialty. *Greene v. Thomas*, 662 P.2d 491, 493 (Colo. Ct.App.1982) (amended *Colo.R.Evid.* 702, identical to *W. Va.R.Evid.* 702, was effective, as amended, July 1, 1981), *cert. denied* (Colo. May 2, 1983).

Third, a medical witness may acquire sufficient knowledge to qualify as an expert through practical experience, recent formal training and study or a combination of these factors. This point is made in *Fitzmaurice v. Flynn*, 167 Conn. 609, 356 A.2d 887 (1975):

> Recognizing the complexity of knowledge required in the various medical specialties, more than a casual familiarity with the specialty of the defendant physician is required. The witness must demonstrate a knowledge acquired from experience or study of the standards of the specialty of the defendant physician sufficient to enable him [or her] to give an expert opinion as to the conformity of the defendant's conduct to those particular standards, and not to the standards of the witness' particular specialty if it differs from that of the defendant. It is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility.

*Id.* at 618, 356 A.2d at 892. *See also Steinbach v. Barfield*, 428 So.2d 915, 920–21 (La.Ct.App.) (when alleged acts of negligence raise issues peculiar to a particular medical specialty, then only those qualified in that specialty may offer evidence of applicable standards), *cert. denied*, 435 So.2d 431 (1983).

Accordingly, under Rule 702 of the *West Virginia Rules of Evidence* or under *W. Va.Code*, 55–7B–7 [1986], a proper assessment of the competency of an expert medical witness, and the relevancy of that witness' testimony, require the trial court to focus specifically on the act of medical malpractice which is alleged; and, while there are circumstances in which, for example, a generalist may testify as to the standard of care of a defendant specialist, there are also circumstances in which a generalist or a specialist in another field may not testify as to the standard of care of a defendant specialist. *See, e.g., Connelly v. Kortz*, 689 P.2d 728, 729–30 (Colo.Ct.App. 1984) (internal medicine specialist who had only casual familiarity with standards of care of general surgeons was not qualified to testify against general surgeon as to proper indications for surgery; *Colo.R. Evid.* 702 cited to support principle that proffered expert witness may attain sufficient qualifications through training, education or experience); *Greene v. Thomas*, 662 P.2d 491, 493–94 (Colo.Ct.App.1982) (trial court did not abuse its discretion in ruling that plaintiff's dermatologist was not qualified to testify as to standard of care for plastic surgeons, where dermatologist had only casual familiarity with plastic surgery procedure at issue; amended *Colo. R.Evid.* 702 in effect at that time), *cert. denied* (Colo. May 2, 1983); *Wielgus v. Lopez*, 525 N.E.2d 1272, 1274 (Ind.Ct.App. 1988) (trial court did not abuse its discretion in excluding anesthesiologist's testimo-

ny, where he was not familiar with surgical standard of care); syl. pt. 2, *Swanson v. Chatterton,* 281 Minn. 129, 160 N.W.2d 662 (1968) (trial court was clearly within its discretion in excluding testimony of plaintiff's medical expert against defendant orthopedic surgeon; although he was chief of medical staff at a large hospital and was a specialist in internal medicine, medical expert had little or no experience with orthopedic surgery procedure at issue and had no familiarity with same except for general learning in medical school fifteen years earlier).

As a result of the efforts of state medical societies, several states recently have adopted statutes governing expert testimony in medical malpractice actions. 3 C. Kramer, *Medical Malpractice* para. 29.02, at 29–7 (1990). Litigation of these statutes in those states which also have their equivalent to Rule 702 of the *West Virginia Rules of Evidence* will develop the law in the area of the interplay between such evidentiary statutes and such evidentiary rules.

On remand the trial court should apply the foregoing principles in exercising sound discretion in its ruling as to whether the plaintiff's proffered medical expert in this case is qualified to testify as to the particular standards of care at issue.

Having addressed the certified question, this case is remanded to the Circuit Court of Mason County for further proceedings consistent with this opinion.

Certified question answered; case remanded.

NEELY, Chief Justice, dissenting in part and concurring in part:

The majority has done a splendid job of dodging the question presented to this Court, which is whether *W.Va.Code,* 55–7B–7 [1986] conflicts with Rule 702, *W.Va. Rules of Evid.,* and if so, which prevails. The majority recognized that the statute is more restrictive than the rule, but wanted to avoid addressing a sticky constitutional question.

I

Just to clear up any misunderstanding, the statute in question does conflict with Rule 702. The statute was, indeed, intended to change the existing law of evidence as codified in our *W.Va. Rules of Evidence.* Comparing the requirements of the statute and the Rule, it is obvious that the former requires much more than the latter. Clauses (b), (c), and (d) of *W.Va.Code,* 55–7B–7 [1986] comport with Rule 702, and simply set out common sense requirements that any reasonable trial judge would insist upon in a medical malpractice case. In fact, clause (c) contains the heart of the Rule 702 test for the admissibility of expert testimony in medical malpractice cases, in its requirement that, "such expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed". Clause (e) goes beyond Rule 702, however, and requires that the expert be "engaged" or "qualified" in the "same or substantially similar medical field" as the defendant.

For clause (e) to have any meaning, it must require something in addition to what the preceding clauses require. Recognizing this fact, and given that the purpose of the Medical Professional Liability Act, of which *W.Va.Code,* 55–7B–7 [1986] is a part, is to alleviate the medical malpractice insurance crisis, "qualified" must mean more than "possessing professional knowledge and expertise coupled with knowledge of the applicable standard of care" [the requirements of clause (c)]. Noting the word "engaged" in clause (e), it would be reasonable to conclude that the drafters intended "qualified", as an alternative to "engaged in", to mean "qualified to engage in".[1] Of course, what fields are "substan-

---

1. I agree with the majority that "qualified to engage in" does not mean "board certified". A physician does not necessarily need to be "board certified" in a medical field in order to work in that medical field. For instance, under the statute, an orthopedic surgeon with sufficient knowledge, experience, or training to be qualified to engage in emergency medicine could "qualify" as an expert witness in a case involving malpractice by an emergency room

tially similar" under *W.Va.Code*, 55–7B–7(e) [1986] is a decision that should be left to the sound discretion of the trial court.

It is easy to imagine a situation where the statute and the rule conflict. For example, under the statute, if a specialist is alleged to have breached a standard of care applicable to all physicians, another physician may still not testify to the breach of that standard of care, unless he is "engaged or qualified in the same or similar medical field." Thus, under the statute, if a neurosurgeon fails to wash his hands before operating, an internist with no claim to expertise in the field of neurosurgery could not testify that the neurosurgeon breached the standard of care applicable to all physicians. Under Rule 702, however, the internist's testimony would be admissible. In fact, it would be an abuse of discretion to exclude the internist's testimony.

Rule 702 is a liberal rule, and we have been commensurately liberal in allowing experts in cases other than medical malpractice to testify. In *W. Va. Dept. of Highways v. Thompson*, 180 W.Va. 114, 375 S.E.2d 585 (1988), we held that a trial court's requirement that a real estate appraiser see the building before forming his opinion was *not* consistent with the *W.Va. Rules of Evid.*, and our previous holdings in condemnation proceedings.

In *Reager v. Anderson*, 179 W.Va. 691, 371 S.E.2d 619 n. 4 (1988), the plaintiff alleged medical malpractice which required the amputation of his left leg. On the issue of damages, he was allowed to present two experts that the defendants claimed were not competent to testify. The experts, a mechanical engineer specializing in bio-mechanics, and a prosthetist, testified about the possible cost of a myoelectrically controlled artificial leg which the

engineer was developing, but which was not yet on the market and was not generally accepted in the field of prosthetics. On appeal, we did not decide whether it was error to admit the challenged expert testimony, but stated that if there was error, it was harmless, and further noted that Rule 702 does *not* require that expert testimony be based upon scientific principles generally accepted in the scientific community.

In Syllabus Point 7 *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990), this Court held that a psychologist may state an opinion about whether a child alleged to be the victim of sexual abuse fits the profile of a sexually abused child, and may offer an opinion about whether the child in question has been sexually abused. The dissent noted that there was no effort by the State to demonstrate the reliability of the "child sexual abuse profile", and noted that the profile was far from universally accepted among experts. *Id.* 183 W.Va. at 667, 398 S.E.2d at 149–150 (Miller, J., dissenting). Of course, as we said in *Reager, supra*, Rule 702 does not require that expert testimony always be based on principles generally accepted in the scientific community.

To the extent that courts have been more careful with the admission of expert testimony in medical malpractice cases, the higher "standard of care" does not come from Rule 702, but is a gloss some courts have added to the bare requirements of Rule 702. Even so, many courts applying the Rule or the common law which preceded the Rule and which formed the basis of the Rule, have treated the admission of experts *even in medical malpractice cases* with a liberality that conflicts sharply with the approach dictated by *W.Va.Code*, 55–7B–7(e) [1986].[2]

---

physician, if the proposed expert were familiar with the standard of care alleged to have been breached, because he regularly took his turn in the emergency room.

**2.** For example, in *Brown v. Sims*, 538 So.2d 901 (Fla.App.1989), corrected 14 F.L.W. 1047, decided in a jurisdiction that has adopted the *Uniform Rules of Evidence*, the court allowed a neurosurgeon to testify that a gynecologist "departed from accepted medical practice by ne-

glecting to obtain a written opinion from a competent physician clearing the patient for surgery and that this departure was a cause of the plaintiff's stroke." 538 So.2d at 903–4.

In *Morlan v. Harrington*, 658 F.Supp. 24 (D.N.D.1986), the court stated:

The general rule is that an expert in a field that recognizes specialties need not be a specialist in order to testify as an expert witness. *Holmgren v. Massey–Ferguson, Inc.*, 516 F.2d 856 (8th Cir.1975). The testimony of a doctor

Precisely because of the liberality with which many courts treat expert testimony in medical malpractice cases, physicians, hospitals, and insurance companies worked hard to get the legislature to impose by statute a stricter standard than that of Rule 702. The situation involved in the case before us, where a plaintiff wants to use one physician to testify against a number of physicians of varying specialties, is fairly common. The statute's limits on who may testify against whom in a medical malpractice action shift the balance toward the defense. Other legislative enactments may favor the plaintiffs. But it is the legislature's province to strike the balance in medical malpractice. We cannot overturn the legislature's solution to the perceived problem just because it may not be the solution we would have selected, any more than we can change the statute of limitations for ejectment, or ignore the requirements of the various statutes of frauds.

The statute will cause courts uniformly to scrutinize medical malpractice experts more closely than they have done in the past under Rule 702. That the statute does, in practical effect, change the general law of evidence in this State is both intentional and acceptable. *W. Va. Code*, 55–7B–7 [1986] is part of a package of statutes passed by the legislature to ameliorate the medical malpractice insurance crisis. In *W. Va. Code*, 55–7B–1 [1986], the Legislature makes its findings of fact and declaration of purpose with regard to its reform package. The legislature recognized that it had a duty to:

> ... balance the rights of individuals to adequate and reasonable compensation with the broad public interest in the provision of services by qualified health care providers who can themselves obtain the protection of reasonably priced and extensive liability coverage.

Balancing the interests of various groups is the basic function of a legislature. *W. Va. Code*, 55–7B–1 [1986] goes on to state:

> ... the purpose of this enactment is to provide for a comprehensive resolution of the matters and factors which the Legislature finds must be addressed to accomplish the goals set forth above. In so doing, the legislature has determined that *reforms in the common law and statutory rights* of our citizens to compensation for injury and death, in the regulation of rate making and other practices by the liability insurance industry, and in the authority of medical licensing boards to effectively regulate and discipline the health care providers under such board must be enacted together as necessary and mutual ingredients of the

---

as an expert witness in a medical malpractice case may not be excluded simply because he is not a specialist. *Harris v. Smith*, 372 F.2d 806 (8th Cir.1967). It is well established that the training and specialization of a physician expert witness in a medical malpractice case goes to the weight rather than to the admissibility of the testimony. *Frost v. Mayo Clinic*, 304 F.Supp. 285 (D.Minn.1969). This principle is established in North Dakota state law. *Benzmiller v. Swanson*, 117 N.W.2d 281 (N.D. 1962). **It is only required that the proposed witness be familiar with the standard of care alleged to have been breached.** *Fitzgerald v. Manning*, 679 F.2d 341 (4th Cir.1982). 658 F.Supp. at 26.

*W. Va. Code*, 55–7B–7 [1986], in clause (e) goes one step further than Rule 702, and makes the question of whether a physician is "engaged or qualified in the same or substantially similar medical field as the defendant health care provider" go to the *admissibility* of the expert testimony, rather than to its weight only. Under the statute, it is not enough to be a physician (and thus have "some specialized knowledge"), and

be familiar with the standard of care alleged to have been breached. The expert must be engaged or qualified in the same or similar medical field. Thus the statute differs sharply from the rule.

In *Posada v. Kilpatrick*, 547 A.2d 163 (D.C. App.1988), the court held that a trial court did not abuse its discretion when it refused to strike, for lack of proper credentials, a general surgeon's testimony on the standard of care for oncology, therapeutic radiology, and vascular surgery. The court noted that "[a]ppellants concede that, in this jurisdiction, a licensed physician is permitted to give expert testimony on the standard of care in a medical specialty even if it is not in the particular area of his or her expertise." *Id.*, at 167 n. 2. The court then cited a 1966 case for that proposition. Although this case was decided in the District of Columbia, which has not adopted the Uniform Rules of Evidence, Rule 702 is, generally, a codification of the common law of expert testimony, and this case comports with a popular common law view of expert testimony.

appropriate legislative response. [Emphasis added].

## II

Certainly the Legislature can change the common law.[3] Under Edward I, a large body of important statutory law was enacted which profoundly affected the growth of the common law. In the process, the various institutions through which law was made took on definite form, and terms such as "statute" and "ordinance" were given definite meanings. As Maitland relates, "the king in parliament can make statutes; the king in council can make ordinances...."[4]

In 1285, the Statute of Westminster II, 13 E. 1, Stat. 1, Cap 24 [1285], relaxed the Provisions of Oxford[5] passed in 1258 that had curtailed the authority of the Lord Chancellor to issue new writs to bring new types of disputes before the royal courts. Until the Provisions of Oxford in 1258, litigants could apply to the Lord Chancellor for a writ authorizing a royal court to decide a particular dispute, and the decision to grant a new writ was what we would call today the creation of a new cause of action. This process was arrested by the Provisions of Oxford, but the Provisions of Oxford's efforts to limit the lawmaking capacity of courts proved impractical, so the Statute of Westminster II authorized the chancellor to issue new writs in *consimili casus* (similar situations). It was under this authority, then, that writs for "trespass" were converted into writs for "trespass on the case" (in other words, trespass in a similar case) and the modern law of negligence was born. Thus, as the ebb and flow of judicial lawmaking power (i.e. ebbtide under the Provisions of Oxford to flowtide under the Statute of Westminster II) amply demonstrate, legislatures have had authority from ancient times to restrict or permit the growth of the unenacted, judge-made common law.

West Virginia has affirmatively adopted a system of common law with legislative supremacy. *W.Va. Const.*, Art. VIII, § 13, states:

Except as otherwise provided in this article, such parts of the common law, and of the laws of this State as are in force on the effective date of this article and are not repugnant thereto, shall be and

---

**3.** That proposition is indisputable from tradition that dates from time out of mind. When William the Conqueror landed in England he found a country that was governed by a great variety of local customs. Over the next three hundred years the Norman kings succeeded in establishing one uniform system of laws through the use of itinerant royal judges who were professional administrators of the law, all trained in one school. In the context of English law, use of the word "common", then, does not mean "ordinary" or "vulgar", but rather "uniform". The term "common law" came into use in England during the reign of Edward I (1272–1307), or shortly thereafter. F. Maitland, *Constitutional History of England* (H. Fisher, ed. Cambridge, 1968). Maitland tells us:

Common law is in the first place unenacted law; thus it is distinguished from statutes and ordinances. In the second place, it is common to the whole land; thus it is distinguished from local customs. In the third place, it is the law of the temporal courts; thus it is distinguished from ecclesiastical law, the law of the Courts Christian, courts which throughout the Middle Ages take cognisance of many matters which we should consider temporal matters—in particular marriages and testaments. Common law is in theory traditional law—that which has always been

law and still is law, *in so far as it has not been overridden by statute or ordinance.* [emphasis added].
Maitland, at 22–23.

**4.** *Id.*, at 20.

Maitland describes how the enactment of a large body of statutes under Edward I affected the growth of the common law:

The vigorous legislation of the time has an important consequence in checking the growth of unenacted law. Henceforward, the common law grows much more slowly than under Henry III. Its growth is hampered at every turn by statute—changes in the law are not to be made without the consent of parliament. Law continues to grow, but it can grow but slowly; the judges are forced to have recourse to fictions and evasions because the highroad of judge-made law has been barred.

*Id.*, at 21.

**5.** The Provisions of Oxford are not included in the official compilations of statutes, but can be found in W. Stubbs, *Select Charters and Other Illustrations of English Constitutional History,* (Clarendon Press, 1870), p. 378–384, translation at 384–387.

continue the law of this State until altered or repealed by the legislature.[6]

*W.Va.Code*, 2-1-1 [1880], provides:

The common law of England, so far as it is not repugnant to the principles of the constitution of this state, shall continue in force within the same, except in those respects wherein it was altered by the general assembly of Virginia before the twentieth day of June, eighteen hundred and sixty-three, or has been, or shall be, altered by the Legislature of this state.[7]

In *Seagraves v. Legg*, 147 W.Va. 331, 127 S.E.2d 605 (1962), a wife sued for loss of consortium of her husband, a cause of action which did not exist at common law, and had not been provided by statute. The Court looked at cases from other states, but then made one crucial observation:

Apparently these states do not have the same constitutional and statutory provisions as West Virginia, and are not committed by their constitution and statutory law to follow the common law unless it is changed, altered or repealed by the legislature, as is West Virginia. [Citations omitted].

*Id.*, 147 W.Va. at 336, 127 S.E.2d at 607. After examining the common law and giving the constitutional and statutory authority binding this State thereto, we succinctly stated:

It is clear, from the constitutional provisions and the statute pertaining thereto, that the legislature has the power to change the common law, and inasmuch as it has not done so in connection with the question involved in this case, the common law relating thereto remains the law of this State. [Citations omitted].

*Id.*, 147 W.Va. at 338, 127 S.E.2d at 608–9. The Court went too far in *Seagraves* when it indicated that *only* the Legislature can change the common law. *See* our discussion in *Morningstar v. Black & Decker*,

162 W.Va. 857, 253 S.E.2d 666 (1979). However, what is apparent from all our cases, both those before *Morningstar* and after, is the indisputable fact that the legislature has the power to change the common law of this State.

### III

Our *Rules of Evidence* were adopted on 18 December 1984, to be effective 1 February 1985, about a decade after the promulgation of the *Federal Rules of Evidence*. The *Federal Rules of Evidence* are merely a judicial codification of common law principles, and remain part and parcel of the common law. Wright and Graham tell us:

A comprehensive history of the law of evidence in federal courts·has yet to be written and, fortunately, a detailed knowledge of the prior caselaw is no longer essential. The new Federal Rules of Evidence are not a product of previous statutes and decisions; instead the drafters chose to build upon earlier efforts of the states to rationalize and codify the common law rules.[8]

Likewise, our own *Rules of Evidence* constitute an attempt to codify the common law of evidence. In *Reager v. Anderson*, 179 W.Va. 691, 371 S.E.2d 619 n. 4 (1988), we noted that Rule 702, *W.Va.Rules of Evid.*, is "generally consistent with the preexisting common law in civil cases in this jurisdiction". [Citation omitted.] In *State v. Welker*, 178 W.Va. 47, 357 S.E.2d 240 (1987), this Court noted that, "Rule 404 is an attempt to codify the common law rules on the admission of character evidence, and we therefore look to the common law for guidance." *Id.*, 178 W.Va. at 50, 357 S.E.2d at 244. The Court asserted the same proposition in *State v. Neuman*, 179 W.Va. 580, 371 S.E.2d 77 (1988), and *State v. Marrs*, 180 W.Va. 693, 379 S.E.2d 497 (1989).

---

**6.** Before the Judicial Reorganization Amendment of 1974, the corresponding provision was found in *W.Va. Const.*, Art. VIII, § 21, which contained the same substance, but lacked the phrase, "Except as otherwise provided in this article."

**7.** The *W.Va.Code* gives the history of this section, "(Code [of Virginia] 1849, c. 16, § 1; Code

[of Virginia] 1860, c. 16, § 1; Const. 1863, art. 11, § 8; Code 1868, c. 13, § 5; Const. 1872 as amended 1879–1880, art. 8, § 21; 1882, c. 143, § 5; Code 1923, c. 13, § 5.)"

**8.** 21 C. Wright and K. Graham, *Federal Practice and Procedure* § 5001 (1977).

As a judicial codification of the common law of evidence, the *Rules of Evidence* must, like the common law, at least conform to the statutes then extant. Although this Court promulgated our *Rules of Evidence* in 1984, we made few changes to the *Federal Rules of Evidence*. However, West Virginia's rape shield statute, *W.Va.Code*, 61–8B–11 [1984], effected a radical change in the common law governing character evidence as articulated in Rule 404, *Fed.R.Evid.* Consequently, when we adopted our *Rules of Evidence* we altered Rule 404 from the federal version expressly to recognize our rape shield statute, *W.Va.Code*, 61–8B–11 [1984], and conformed the Rule to the statute.

The *Rules of Evidence* establish a foundation for further development of evidence law. Lawyers may look to evidence cases decided before the adoption of the *Rules of Evidence*, but generally such research is not required. This saves time, money, and confusion. But from the starting point of the *Rules of Evidence*, the law of evidence can be changed, either by the courts or by the Legislature.[9]

The Legislature has supplemented this Court's *Rules of Evidence* with our hearty approval. In *State v. Stacy*, 179 W.Va. 686, 371 S.E.2d 614 (1988), this Court noted that the *"West Virginia Rules of Evidence* are supplemented in sexual abuse cases by *W.Va.Code*, 61–8B–11(c) [1984] which provides that neither age nor mental capacity precludes a victim of sexual abuse from testifying." *Id.*, 179 W.Va. at 691, 371 S.E.2d at 619. The Court noted that the statute "may be required to yield if it conflicts with well-established due process constitutional rights," but did not even imply that the statute would need to yield if it conflicted with a rule of evidence.

## IV

In most areas of the law, the Court and the Legislature share power. The Legislature may enact a general law, and the Court then determines how that law applies to specific circumstances. However, there are certain areas where power is not shared. At one extreme, the Legislature has exclusive control over what goes into the State budget (except for the judicial budget).[10] At the other extreme, this Court alone may prescribe qualifications for admission to the bar of this State. *Pushinsky v. Bd. of Law Examiners*, 164 W.Va. 736, 266 S.E.2d 444 (1980). The law of evidence lies between the two extremes, governed jointly by this Court and by the Legislature, with the Legislature able to preempt us by enacting statutes.

Appellant argues that because the *Rules of Evidence* are procedural rules promulgated by this Court, they are constitutionally superior to any conflicting statutes, and appellant relies on several of our opinions holding certain procedural and administrative rules to supercede conflicting statutes. Some of the cases cited contain broad wording to the effect that procedural rules promulgated by this Court supercede conflicting statutes by virtue of two sections of the Judicial Article of this State's *Constitution*. To the extent that the cases say that *all* rules promulgated under this court's rulemaking powers supercede conflicting statutes, the cases are wrong.

*W.Va. Const.*, Art. VIII, § 3, enacted as part of the Judicial Reorganization Amendment of 1974, sets out the jurisdiction and powers of the Supreme Court. Among our powers is the power to promulgate certain rules:

> The court shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the State relating to writs, warrants, pro-

---

**9.** In a discussion of the movement to codify the law of evidence, Professors Saltzburg and Martin remind us that because of *stare decisis*, common law courts are hesitant to change a legal rule, even one of questionable value, if it has stood over time. Many judges feel that "legislative intervention is a more appropriate response than judicial overruling." 1 S. Saltzburg and M.

Martin, *Federal Rules of Evidence Manual* (1990) 1. I've never seen the court that Professors Saltzburg and Martin describe, but I take it on faith that such a court might exist somewhere, or at least pretend to exist.

**10.** *See, W.Va. Const.*, Art. VI, § 51 [1968].

cess, practice and procedure, which shall have the force and effect of law.[11]

Article VIII, § 3 also gave us "general supervisory control" over the judiciary, and gave the Chief Justice the power temporarily to move judges from circuit to circuit as needed. However, Article VIII, § 3 contains no statement that the Court's power to make procedural law excludes the legislature from the area.

*W.Va. Const.*, Art VIII, § 8,, on the other hand, gives this Court the power to make rules regulating the judiciary and the legal profession, and states that such rules supercede any conflicting statutes:

> Under its inherent rule-making power, which is hereby declared, the supreme court of appeals shall, from time to time, prescribe, adopt, promulgate and amend rules prescribing a judicial code of ethics, and a code of regulations and standards of conduct and performances for justices, judges and magistrates, along with sanctions and penalties for any violation thereof.... When *rules herein authorized* are prescribed, adopted and promulgated, they shall *supersede all laws and parts of laws in conflict* therewith, and such laws shall be and become of no further force or effect to the extent of such conflict. [emphasis added].

If the drafters and ratifiers of the Judicial Reorganization Amendment had wanted the Court's power in the area of procedural law to exclude the legislature from any involvement, the language underlined above would have been included in Article VIII, § 3. The language was not, so our rules of procedure should not be considered immune from legislative tinkering.

We have been somewhat sloppy in our application of *W.Va. Const.*, Art. VIII, § 8 and *W.Va. Const.*, Article VIII, § 3. We have confused our Article VIII, § 8 power to regulate the integrity of the legal profession and the judiciary, with our Article VIII, § 3 control over procedural matters,

so that we have ended up applying the superceding provision of *W.Va. Const.*, Art. VIII, § 8, to rules that could only have been promulgated under Article VIII, § 3, our general rule-making power.

In Syl. Pt. 2 of *Stern Bros., Inc. v. McClure*, 160 W.Va. 567, 236 S.E.2d 222 (1977) we stated:

> Under Article VIII, Section 8 of the Constitution of West Virginia (commonly known as the Judicial Reorganization Amendment), the *administrative* rules promulgated by the Supreme Court of Appeals of West Virginia have the force and effect of statutory law and operate to supercede any law that is in conflict with them. [emphasis added].

This syllabus point went too far. In *Stern Bros*, the administrative rule in question controlled the procedure for selecting a temporary judge upon the disqualification of a circuit judge, a matter addressed by *W.Va. Const.*, Art. VIII, § 3, but related to *W.Va. Const.*, Art. VIII, § 8, because disqualification of judges is connected with the maintenance of the integrity of the judiciary. The administrative rule superceded three obsolete statutes that were last amended several decades before the passage of the Judicial Reorganization Amendment of 1974, namely, *W.Va.Code*, 51–2–9 [1931], 51–2–10 [1931], and 56–9–2 [1939]. The ultimate conclusion the Court reached in *Stern Bros.* was that the Judicial Reorganization Amendment made the old statutes entirely obsolete because control of the subject matter addressed by the statutes, namely, the replacement of disqualified judges, had been transferred to the Court by virtue of the Amendment. Thus there was no need for the broad holding embodied in syllabus point two of *Stern Bros.*

The Court addressed another situation involving the appointment of a special judge in *State ex rel. Crabtree v. Hash*,

---

11. This Court noted in *Pushinsky v. W.Va. Bd. of Law Examiners*, 164 W.Va. 736, 266 S.E.2d 444 (1980), that the provision is inaccurately reproduced in Michie's West Virginia Code, so that it is missing the comma between "process" and "practice". This Court found the mistake by checking the Michie version against the correct version, found in Acts of the Legislature, Regular Session 1974, Committee Substitute for Senate Joint Resolution No. 6, § 3, pp. 948–949. 164 W.Va. at 748 n. 13, 266 S.E.2d at 451 n. 13.

180 W.Va. 425, 376 S.E.2d 631 (1988), and held that *W. Va. Const.*, Art. VIII, §§ 3 and 8, and the administrative rules made pursuant to these provisions, superceded any conflicting statute and vested the Chief Justice of this Court with the sole power to appoint a judge for temporary service in any situation requiring such an appointment. Again, the holding was far broader than was needed to reach the correct result. The statute controlling the pre-amendment selection of special judges, *W. Va. Code*, 51–2–10 [1931], was made entirely obsolete by the Judicial Reorganization Amendment, which permitted this Court to assign judges from one Circuit to another, a power we did not have before the Amendment. Therefore, our rules did not supercede the statutes, but rather the Judicial Reorganization Amendment's provision allowing the chief justice to appoint temporary judges superceded the obsolete statutes.

From the sloppy lumping together of *W. Va. Const.*, Art. VIII, §§ 3 and 8 in *State ex rel. Crabtree v. Hash*, we went on in *State v. Davis*, 178 W.Va. 87, 357 S.E.2d 769 (1987), to apply the superceding power of *W. Va. Const.*, Art. VIII, § 8, to a purely procedural rule promulgated under our *W. Va. Const.*, Art. VIII, § 3 rule-making power. We held that Rule 7(c)(1), *W. Va. Rules Crim. Proc.*, involving the form of a jury indictment, superseded *W. Va. Code*, 62–9–1 [1931], a statute passed long before the Judicial Reorganization Amendment. This Court noted that the Rule was promulgated pursuant to the Court's rule-making authority under *W. Va. Const.*, Art. VIII, § 3, and that such rules supercede conflicting statutes. However, in *Davis* the statute was old and arguably obsolete; had the Legislature passed a statute on indictments *after* the Judicial Reorganization Amendment an issue would have been raised closer to the issue now before us.

V

If the line of cases discussed immediately above is to be left undisturbed, at least for the moment, I would urge that the cases be read as standing for the proposition that *purely administrative and procedural rules* supercede conflicting statutes. The *West Virginia Rules of Evidence*, although they were promulgated by this Court, are part of the substantive common law of this state, and do not belong to the class of purely procedural or administrative rules that have been held by this court to supercede conflicting statutes. The *Rules of Evidence* and the additional decisional law generated in the application of the *Rules of Evidence* may be supplemented, explained, added to, or altered by subsequent statutes enacted by the Legislature, like the statute involved here concerning medical malpractice.

Perhaps the relationship between new Court rules and ancient tradition can be illuminated by looking at an analogous situation that arose under the *Federal Rules of Civil Procedure*. When the U.S. Supreme Court promulgated the *Federal Rules of Civil Procedure* in 1938, it merged the procedure for law and equity, and established one form of action. Yet, the change in procedure effected no change in underlying substantive rights. Historically, the right to jury trial attached to legal cases. The Seventh Amendment to the U.S. *Constitution* specifically guarantees that the right to jury trial in legal cases will be preserved.[12] The U.S. Supreme Court, in *Curtis v. Loether*, 415 U.S. 189, 193, 94 S.Ct. 1005, 1007, 39 L.Ed.2d 260 (1974), said that the "thrust of the Amendment was to preserve the right to jury trial as it existed in 1791," but that "it has long been settled that the right extends beyond the common-law forms of action recognized at that time." The Court then laid out the historical approach established by Justice Story in *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 7 L.Ed. 732 (1830):

**12.** The Seventh Amendment to the U.S. *Constitution* provides:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and

> no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

"The phrase 'common law,' found in this clause, is used in contradistinction to equity, and admiralty, and maritime jurisprudence.... By *common law*, [the Framers of the Amendment] meant ... not merely suits, which the *common* law recognized among its old and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.... In a just sense, the amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever might be the peculiar form which they may assume to settle legal rights." *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446–447, 7 L.Ed. 732 (1830) (emphasis in original).

415 U.S. at 193, 94 S.Ct. at 1007–08.[13] The right to jury trial has even been held to attach to actions enforcing statutory rights, "if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Id.*, at 194, 94 S.Ct. at 1008. Thus courts have used a modified historical test to untie the knotty issue of the right to jury trial after the merger of law and equity under court-made rules.

The proper test for determining whether a subject governed by our court rules can also be governed by the legislature is likewise partially historical. Thus, if the subject over which the legislature seeks to exercise jurisdiction was traditionally a subject covered by common law, a statute likely will be superior to a court rule. However, *W.Va. Const.*, Art. VIII, § 8 *expressly* commends to us exclusively certain specific matters such as the governance of judicial officers, but this is a very narrow conveyance of power.

In this last regard, it should be remembered that more than any other court-promulgated rules, the rules of evidence significantly address substantive rights. The old dichotomy between procedural rules and substantive rules is usually more illusory than it is illuminating, and this is certainly the case in the area of evidence. For example, perfectly legitimate contracts can be made unenforceable by the provisions of the statutes of frauds—*W.Va.Code*, 55–1–1 [1990], concerning contracts in general, and *W.Va.Code*, 36–1–3 [1923], concerning real estate—and heirs can lose what would otherwise be open and shut lawsuits because of the proscriptions of the Dead Man's Statute, *W.Va.Code*, 57–3–1 [1937].

In the case before us, the Legislature was obviously concerned with what it perceived as abuses in medical malpractice cases. Committees of the Legislature undoubtedly discussed alternative ways of achieving the goal of adjusting the balance between plaintiffs and defendants and chose to avail themselves of "procedural" mechanisms for achieving a different balance rather than "substantive" mechanisms. As the statutes of fraud, the Dead Man's Statute, the rape shield law, and the statutes governing the testimony of child victims in sexual assault and abuse cases amply demonstrate, the Legislature often repairs to evidentiary rules to achieve substantive results. And, no one can argue that the Legislature is not entitled to rearrange such substantive results. It would, then, be counter-productive to foreclose the use of tools such as modifications of the law of evidence traditionally thought to be available to legislatures.

For the reasons stated above, I would reverse the trial court's answer to the certified question in the negative, and hold that *W.Va.Code*, 55–7B–7 [1986] differs sharply from Rule 702, *W.Va.Rules of Evid.* I would also hold that the statute prevails over the Rule.

June 11, 1991

BROTHERTON, J., joins in opinion of NEELY, C.J.

---

**13.** *See* also, *Beacon Theatres v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and *Dairy Queen v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).